184 P.2d 416

**ALBUQUERQUE BROADCASTING CO. v. BUREAU OF REVENUE et al.**

No. 4998.

Supreme Court of New Mexico.

Aug. 11, 1947.

Rehearing Denied Sept. 10, 1947.

A. T. Hannett, of Albuquerque, for appellant.

Harry L. Bigbee and Louis C. Lujan, both of Santa Fe, for appellees.

BRICE, Chief Justice.

The question is whether the appellant is liable to the Emergency School Tax as provided in Art. 14, N.M.Sts.1941, as follows:

"There is hereby levied, and shall be collected by the bureau of revenue, privilege taxes, measured by the amount or volume of business done, against the persons, on account of their business activities, engaging or continuing, within the state of New Mexico, in any business as herein defined, and in the amounts determined by the application of rates against gross receipts, as follows:

\* \* \* \* \* \*

"G. At an amount equal to two (2) percent of the gross receipts of the business of every person engaging or continuing in the business of conducting \* \* \* radio broadcasting stations \* \* \*." Sec. 76-1404, N.M.Sts.1941.

The trial court was of the opinion that the appellant was liable to such tax and entered its judgment accordingly. The appellant is of the opinion that the tax is a burden on interstate commerce and is exempt under the commerce clause of the federal constitution and under the following statute: "None of the taxes levied by this act shall be construed to apply to sales made to the government of the United States or any agency or instrumentality thereof, except a corporate agency or corporate instrumentality, nor to sales to the state of New Mexico or any of its political subdivisions; provided that deposits of gold and silver with the United States' mint shall not be considered as sales to the

government of the United States and shall not be exempt hereunder; nor shall such taxes apply to any businesses or transactions exempted from taxation under the Constitution of the United States or the state of New Mexico." Sec. 76-1405, N.M. Sts.1941.

At the conclusion of the trial of the case the trial court made the following decision:

"1. The plaintiff is a corporation organized under the laws of the State of New Mexico, with its principal office and place of business in Albuquerque, New Mexico.

"2. The Bureau of Revenue of the State of New Mexico, created by the legislature of said state and charged with the duty and function of collecting taxes levied by the Emergency School Tax Act of the State of New Mexico (Ch. 73, Session L. 1935, as amended), is hereinafter referred to as the Act; R. L. Ormsbee is the Commissioner of said Bureau, and Earle Kerr is the Director of the School Tax Division of said bureau. Said bureau and said named defendants maintain their offices in the Capitol building at Santa Fe, New Mexico.

"3. That in the month of May, 1936, plaintiff engaged in the radio broadcasting business at Albuquerque, New Mexico, and ever since said date has held, and now holds a commercial license to broadcast by radio, said license having been issued by the Federal Communications Commission under the Federal Communications Act of 1934, as amended [47 U.S.C.A. § 151 et seq.].

"4. Plaintiff at all times since the issuance of a license to it has operated its radio broadcasting station KOB and now continues to operate the same.

"5. In connection with its broadcasting business, plaintiff maintains a studio in Albuquerque where programs are rendered, which programs are broadcast over its transmitter located some eight miles distant, both in Bernalillo County, New Mexico, and the plaintiff broadcasts by the generation at the broadcasting station of electro magnetic waves which pass through space to receiving instruments which amplify them and translate them into audible sound waves; the essential elements in the broadcasting operations conducted by the plaintiff are a supply of electric energy, a transmitter, the connecting medium of 'ether' between the transmission and receiving mechanism, located in this and said other states.

"6. That plaintiff's station KOB located at Bernalillo County near Albuquerque, as aforesaid, employs apparatus for the transmission on a frequency of 770 kilocycles assigned by Federal Communications Commission of signals by radio to the receiving instruments of residents of at least sixteen states, as well as the Republic of Mexico and Dominion of Canada.

"7. Plaintiff's entire income consists of payments to it by advertisers for broadcasts from its Albuquerque station of advertising programs originating there or transmitted to it from other states by wire, a major portion of which originates in other states, and is transmitted to Station KOB by the National Broadcasting System, American Broadcasting Company (formerly Blue Network), or Mutual Broadcasting System over interstate telephone wires acting as common carriers in interstate commerce. Plaintiff sells time to its customers at stipulated rates during which it broadcasts from its station such advertising programs as may be agreed upon. During such time as is not sold it broadcasts at its own expense sustaining programs as required by regulations of Federal Communications Commission.

"8. That the plaintiff, in serving potential listeners in sixteen states, broadcasts the advertising material of its customers to many times more potential listeners who are prospective customers of its advertisers outside the boundaries of New Mexico than it reaches within the boundaries thereof.

"9. The programs broadcast from KOB consist of advertising programs and sustaining programs. The advertising programs are of three types.

"(a) Network programs supplied by national network broadcasting companies through the State of New Mexico on the interstate wires of the American Telephone and Telegraph Company, which wires are tapped by KOB at Albuquerque. These chain broadcasting companies programs so transmitted and tapped originate in studios maintained in other states and countries.

"(b) National spot advertising which is a program supplied by national advertisers and reaches the studio of the plaintiff for broadcasts by means of transcription from outside of New Mexico, or by phonograph records or transcriptions transmitted in interstate commerce from other states to the KOB studio for broadcasting.

"(c) Local advertising broadcasts which originate locally in the studio of KOB, but are heard in said sixteen other states.

"10. Radio Station KOB is affiliated with the chain broadcasting companies as heretofore found herein, and chain broadcasting is conducted by national broadcasting chains and KOB in the following manner, to-wit:

"Using the National Broadcasting Company, hereinafter referred to as NBC, as an illustration, NBC maintains its principal studios in New York, New York, and in Hollywood, California, where the major portion of its programs originate, and all NBC programs which are broadcasted over KOB originate outside the State of New Mexico. NBC has affiliated its chain of broadcasting stations to 152 stations in the

United States and Canada, and it solicits advertising from national manufacturers and others interested in marketing commodities on a nationwide scale. It solicits business from such advertisers, and after offering them a program which is tentatively accepted by the advertisers, the NBC thereupon submits by teletype message to its 152 affiliates a program including the advertisers' message. KOB and other affiliates reply by teletype to the New York office of NBC and if a sufficient number of stations agree to accept the program, NBC thereupon advises the advertisers of the number of affiliates who have accepted and who are willing to clear for the definite time; if the number is sufficient and sufficiently diversified in territory to suit the desires of the advertisers a contract is thereupon entered into between NBC and the advertisers. NBC commits itself to nothing until NBC actually has a buyer for KOB time, and KOB has agreed to sell that time.

"11. The program is thereupon delivered by a voice into the microphone of NBC in its studio in New York, Hollywood, or elsewhere outside the State of New Mexico. KOB received the voice's message over interstate telephone wires from the studio outside the state, and by the turning of a switch, connects the interstate telephone wire with the mechanical facilities of KOB. The program, including the advertiser's message, goes out on the ether and is relayed and amplified and broadcast by the broadcasting facilities of KOB.

"12. · By the foregoing process, KOB delivers its potential listening audience in the area it serves to the voice at the microphone in New York or Hollywood, as the case may be, and the voice delivers the message into the radio receiving sets in such area and the message is available to all potential listeners in said area who choose to tune in. If the voice delivering the advertiser's message in the program in New York or Hollywood, as the case may be, stops, the message stops. KOB upon turning the switch and or connecting its facilities with the national hookup becomes an integral part of all affiliates using the program to fulfill the intent and purpose of NBC to blanket and offer the programs to every listener in the United States and Canada.

"13. NBC determines the value of KOB's service as a part of its chain by making its own investigations and surveys as to the number of potential listeners served by KOB and on its survey, so made, determines the value of KOB to its chain and compensates it for such service accordingly.

"14. Radio broadcasting stations, including the plaintiff's station, are necessarily engaged in interstate commerce whenever delivering an advertising message of their customers into the ether by radio, because modern science has as yet found no method

by which to control radio message within state lines.

"15. Uncertainty has previously existed among those in interest as to whether the owners of radio stations in New Mexico were required to secure a license, pay the license tax or fee, make returns, pay excise taxes, and otherwise comply with the provisions of the Emergency School Tax Act of the State of New Mexico.

"16. Plaintiff has not, in the past, made returns and paid excise taxes pursuant to the provisions of the Emergency School Tax Act, and until recently neither the defendants nor any of their predecessors in office, made demand of plaintiff for the payment of taxes, but defendants demanded, on September 21, 1945, that plaintiff pay, as of October 30, 1945, taxes, penalties and interest, as provided by the Emergency School Tax Act.

"17. That all of plaintiff's broadcasting activities are located within the State of New Mexico, and all of their broadcasting activities are located and performed solely within the State of New Mexico."

### Conclusions of Law

"I. The business in which plaintiff is engaged is in part interstate commerce, and part intrastate commerce. The requirements of the Emergency School Tax Act with respect to payment of the privilege tax levied therein of 2% are not in direct and necessary effect a substantial burden upon interstate commerce.

"II. The Emergency School Tax Act of the State of New Mexico does not discriminate against interstate commerce, and treats both interstate commerce and intrastate commerce equally, and does not create a burden upon interstate commerce, as applied to radio broadcasting companies, and the tax involved in this action, levied by the statutes of the state of New Mexico upon radio broadcasting, is a legal and constitutional tax.

"III. The Emergency School Tax Act of the State of New Mexico, as applied to the business of radio broadcasting, is hereby declared to be a constitutional tax, and is a non-discriminatory tax, which does not create a burden upon interstate commerce, and is therefore declared to be legally levied against the business of radio broadcasting.

"IV. The Court finds that it has jurisdiction of the parties and the subject matter hereto, and that judgment should be entered for the defendant, to the extent of the Court's judgment in this case."

The Supreme Court of the United States, in the case of Fisher's Blend Station v. Tax Commission of the State of Washington, 297 U.S. 650, 56 S.Ct. 608, 610, 80 L.Ed. 956, has decided the question here posed, in favor of the appellant. The statutes of Washington, construed in that case, are in

practical effect not different from those here involved; and the facts are substantially the same. It was conceded by the appellee in the argument that unless by subsequent decisions that court has overruled or modified the decision in the Fisher's Blend case, the district court erred in holding appellant liable to the tax.

The Fisher's Blend case follows a long line of decisions of the Supreme Court of the United States in which it is held that a state cannot tax interstate commerce either by laying the tax upon the business which constitutes such commerce or the privilege of engaging in it, or upon the receipts, as such, derived from it; or as is stated in the opinion, "As appellant's income is derived from interstate commerce, the tax, measured by appellant's gross income, is a type that has long been held to be an unconstitutional burden on interstate commerce."

We are constrained to quote freely from the opinion of Mr. Justice Stone in the Fisher's Blend case, because of the claim that its doctrine, long followed by that court, had been overruled, or so impaired by exceptions that this case is no longer authority on the question of whether interstate commerce can be taxed under state law. The opinion states:

"Appellant's entire income consists of payments to it by other broadcasting companies or by advertisers for broadcasting, from its Washington stations, advertising programs originating there or transmitted to them from other states by wire. Appellant 'sells time' to its customers at stipulated rates, during which it broadcasts from its stations such advertising programs as may be agreed upon. During such time as is not sold, it broadcasts, at its own expense, 'sustaining' programs, as required by the regulations of the Federal Radio Commission. The customers desire the broadcasts to reach the listening public in the areas which appellant serves, and a large number of persons, many of them in other states, listen to the broadcasts from appellant's stations.

\* \* \* \* \* \*

"\* \* \* Upon the facts alleged, we see no more basis for saying that appellant's customers do the broadcasting than for saying that a patron of a railroad or a telephone company alone conducts the commerce involved in his railroad journey or telephone conversation.

"Appellant is thus engaged in the business of transmitting advertising programs from its stations in Washington to those persons in other states who 'listen in' through the use of receiving sets. In all essentials its procedure does not differ from that employed in sending telegraph or telephone messages across state lines, which is interstate commerce. \* \* \* In each, transmission is effected by means of energy manifestations produced at the point of reception in one state which are generated

and controlled at the sending point in another. Whether the transmission is effected by the aid of wires, or through a perhaps less well-understood medium, 'the ether,' is immaterial, in the light of those practical considerations which have dictated the conclusion that the transmission of information interstate is a form of 'intercourse,' which is commerce. * * *

"* * * The essential purpose and indispensable effect of all broadcasting is the transmission of intelligence from the broadcasting station to distant listeners. It is that for which the customer pays. By its very nature broadcasting transcends state lines and is national in its scope and importance—characteristics which bring it within the purpose and protection, and subject it to the control, of the commerce clause. * * *

"As appellant's income is derived from interstate commerce, the tax, measured by appellant's gross income, is of a type which has long been held to be an unconstitutional burden on interstate commerce. * * *

"* * * It is enough that the present (tax) is levied on gross receipts from appellant's entire operations, which include interstate commerce. As it does not appear that any of the taxed income is allocable to intrastate commerce, the tax as a whole must fail * * *."

As we understand, it is not held in the Fisher's Blend case that all broadcasting is interstate commerce, but that as the tax was levied on the gross income, which included that from interstate commerce, it followed that it was an unauthorized tax levied on interstate commerce.

While the trial court found that the businesses and transactions of the appellant were both interstate and intrastate commerce, no attempt was made by the taxing authorities to allocate any portion to either class. The claim of appellee is that while the tax is levied on interstate commerce, it is not an undue burden thereon; and requires it to bear only its just share of state taxes.

That no state could tax the gross receipts from interstate transportation or communication was until recently thought settled beyond controversy. It was so decided in Philadelphia & S. M. Steamship Co. v. Pennsylvania, 122 U.S. 326, 7 S.Ct. 1118, 30 L.Ed. 1200, which overruled Erie Railway Co. v. Pennsylvania, 15 Wall. 282, 21 L.Ed. 164. This was followed in innumerable decisions of that court; and reaffirmed in the Fisher's Blend Case, in which the Philadelphia & S. M. Steamship case was cited approvingly. Also in Puget Sound Stevedoring Co. v. Tax Commission, 302 U.S. 90, 58 S.Ct. 72, 74, 82 L.Ed. 68, in which it was held that a tax on the gross income of a stevedoring company was void, and disposed of the question by the statement: "The business of loading and unloading (ships) being interstate or foreign com-

merce, the state of Washington is not at liberty to tax the privilege of doing it by exacting in return therefor a percentage of the gross receipts. Decisions to that effect are many and controlling." The Court cited as authority the Philadelphia & S. M. Steamship Co. case, and many others.

Later, at the same term, that court decided Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 58 S.Ct. 546, 82 L. Ed. 823, 115 A.L.R. 944, appealed from this court. See Western Live Stock v. Bureau of Revenue, 41 N.M. 141, 65 P.2d 863, and 41 N.M. 288, 67 P.2d 505.

The facts as stated by the Supreme Court are as follows [303 U.S. 250, 58 S.Ct. 547]: "Appellants publish a monthly livestock trade journal which they wholly prepare, edit, and publish within the state of New Mexico, where their only office and place of business is located. The journal has a circulation in New Mexico and other states, being distributed to paid subscribers through the mails or by other means of transportation. It carries advertisements, some of which are obtained from advertisers in other states through appellants' solicitation there. Where such contracts are entered into, payment is made by remittances to appellants sent interstate; and the contracts contemplate and provide for the interstate shipment by the advertisers to appellants of advertising cuts, mats, information and copy. Payment is due after the printing of such advertisements in the journal and its ultimate circulation and distribution, which is alleged to be in New Mexico and other states."

In stating reasons for sustaining the tax, the court said:

"In the present case the tax is, in form and substance, an excise conditioned on the carrying on of a local business, that of providing and selling advertising space in a published journal, which is sold to and paid for by subscribers, some of whom receive it in interstate commerce. The price at which the advertising is sold is made the measure of the tax.

\* \* \* \* \* \*

"As we have said, the carrying on of a local business may be made the condition of state taxation, if it is distinct from interstate commerce, and the business of preparing, printing and publishing magazine advertising is peculiarly local and distinct from its circulation whether or not that circulation be interstate commerce. \* \* \*

"All the events upon which the tax is conditioned—the preparation, printing and publication of the advertising matter, and the receipt of the sums paid for it—occur in New Mexico and not elsewhere. All are beyond any control and taxing power which, without the commerce clause, those states could exert through its dominion over the distribution of the magazine or its subscribers. The dangers which may ensue from the imposition of a tax measured by

gross receipts derived directly from interstate commerce are absent."

In differentiating the Fisher's Blend case the court said: "In this and other ways the case differs from Fisher's Blend Station v. State Tax Commission, [297 U.S. 650, 56 S.Ct. 608, 80 L.Ed. 956], supra, on which appellants rely. There the exaction was a privilege tax laid upon the occupation of broadcasting, which the court held was itself interstate communication, comparable to that carried on by the telegraph and the telephone, and was measured by the gross receipts derived from that commerce. If broadcasting could be taxed, so also could reception. Station WBT v. Poulnot, D.C., 46 F.2d 671. In that event a cumulative tax burden would be imposed on interstate communication such as might ensue if gross receipts from interstate transportation could be taxed. This was the vice of the tax of a percentage of the gross receipts from goods sold by a wholesaler in interstate commerce, held invalid in Crew Levick Co. v. Pennsylvania [245 U.S. 292, 38 S.Ct. 126, 62 L.Ed. 295], supra. In form and in substance the tax was thought not to be one for the privilege of doing a local business separable from interstate commerce."

It is not the reasons stated for sustaining the tax, but some general observations regarding the power of the state to tax interstate commerce that have caused much comment (see Gross Receipts Taxes and Interstate Transportation and Communication, 57 Harv.L.Review 40; Sales Tax in Interstate Commerce, 52 Harv.L.Review 617, both by Wm. B. Lockhard. Also see 28 California L. Review 168; and 36 Illinois L. Review 727); and have so divided that court that all subsequent decisions on the subject lack unanimity. We have reference to the following in Western Live Stock case, to-wit:

"It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business. 'Even interstate business must pay its way' (citations), and the bare fact that one is carrying on interstate commerce does not relieve him from many forms of state taxation which add to the cost of his business. He is subject to a property tax on the instruments employed in the commerce (citations) and if the property devoted to interstate transportation is used both within and without the state, a tax fairly apportioned to its use within the state will be sustained. (Citations.) Net earnings from interstate commerce are subject to income tax (citations), and, if the commerce is carried on by a corporation, a franchise tax may be imposed, measured by the net income from business done within the state, including such portion of the income derived from interstate commerce as may be justly attributable to business done within

the state by a fair method of apportionment. (Citations.)

"All of these taxes in one way or another add to the expense of carrying on interstate commerce, and in that sense burden it; but they are not for that reason prohibited.

"On the other hand, local taxes, measured by gross receipts from interstate commerce, have often been pronounced unconstitutional. The vice characteristic of those which have been held invalid is that they have placed on the commerce burdens of such a nature as to be capable, in point of substance, of being imposed (citations) with equal right by every state which the commerce touches, merely because interstate commerce is being done, so that without the protection of the commerce clause it would bear cumulative burdens not imposed on local commerce. (Citations.) The multiplication of state taxes measured by the gross receipts from interstate transactions would spell the destruction of interstate commerce and renew the barriers to interstate trade which it was the object of the commerce clause to remove. * * * Taxation measured by gross receipts from interstate commerce has been sustained when fairly apportioned to the commerce carried on within the taxing state (citations), and in other cases has been rejected only because the apportionment was found to be inadequate or unfair. (Cita-

tions.) Whether the tax was sustained as a fair means of measuring a local privilege or franchise (citations), or as a method of arriving at the fair measure of a tax substituted for local property taxes (citations), it is a practical way of laying upon the commerce its share of the local tax burden without subjecting it to multiple taxation not borne by local commerce and to which it would be subject if gross receipts, unapportioned, could be made the measure of a tax laid in every state where the commerce is carried on."

It is the appellee's contention that the effect of the Western Live Stock opinion is to hold that a state may tax interstate commerce if the tax is apportioned so that it will not discriminate in favor of intrastate commerce, and the circumstances are such that the same funds could not be subject to a similar tax by other states.

This seems to be correct, or it is in so far as transportation and communication cases are involved. But it must be noted that the Court singled out the Fisher's Blend case as one that did not come within these rules; the theory being that if broadcasting could be taxed, so also could reception, with the result that a cumulative tax burden might be imposed on interstate commerce. This reasoning was questioned by Prof. Wm. B. Lockhart, in an article in which the opinion in this case was critically analyzed, entitled "Gross Receipts

Taxes on Transportation," 52 Harvard L. Review, p. 40. It is therein stated:

"The Fisher's Blend case is not quite so simple. There the broadcasting operations were confined to the taxing state, but the programs were heard over several states. The tax was measured by the entire gross receipts. Yet in no practical sense was there any risk of a cumulative tax burden sufficient to condemn the tax. The mere fact that radio waves reach into other states would hardly give those states jurisdiction to tax the gross receipts derived from broadcasting operations conducted exclusively within the State of Washington. Even the Western Live Stock opinion did not suggest this fantastic possibility. The explanation there given was that 'if broadcasting could be taxed, so could reception,' thus causing a 'cumulative tax burden * * * on interstate communication.' This was an unrealistic and unsuccessful attempt to distinguish the Fisher's Blend case. If such an unlikely tax were imposed it would not result in a cumulative burden within the meaning of that doctrine in current cases. This is demonstrated by the Western Live Stock decision itself, where the Court sustained a tax involving a greater risk of such a cumulative burden than did the Fisher's Blend tax.

"The type of tax on reception which the Court had in mind was a privilege or license tax imposed on the ownership or operation of radio receiving sets. Such a tax would not be borne by the radio broadcasters, or their advertisers, and would have no substantial effect upon the business of engaging in interstate radio broadcasting. Only one such tax appears to have been imposed in the United States, and that had been held invalid. Station WBT v. Poulnot, D.C., 46 F.2d 671."

The statement (which has been repeated in subsequent decisions), that "it was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden," would seem to have little substance, if the decision in Fisher's Blend is controlling, and "just share of state tax burden" means an equal burden upon the same class of business taxed. How could the appellant be compelled to pay its "just share of state [taxes]," or any share, for that matter, if broadcasting cannot be taxed by the states? True, its property used in broadcasting is taxed, but so is the property used in intrastate business, which in a like class, must nevertheless pay this tax on all business transacted, although it receives no more protection from the state than appellant. But the confusion brought about by the Western Live Stock decision is apparent in all subsequent decisions of the Supreme Court on this question, none of which have the support of all the justices of that court.

The rationale of Western Live Stock, in this court and in the Supreme Court of the United States, was that the tax was levied on the pursuits of a local business; that it was not directly imposed upon receipts from interstate commerce, and could not be the subject of taxation by any other state.

The State of Washington has similar tax statutes to those here involved. A gross income tax was levied on the receipts from the business of marketing fruit shipped outside the state. The Washington Supreme Court held that the business of appellant, who was the marketing agent of fruit growers, was local, and was therefore subject to the tax. Gwin, White & Prince v. Henneford, 193 Wash. 451, 75 P.2d 1017. But the Supreme Court of the United States reversed the Washington decision (Gwin, White & Prince v. Henneford, 305 U.S. 434, 59 S.Ct. 325, 327, 83 L.Ed. 272), and held that as the tax was laid upon the number of boxes of fruit transported to purchasers outside the state, so that the tax though nominally imposed upon appellant's activities in Washington, the method of measuring the tax rendered appellant's activities within and without the state a direct burden upon interstate commerce. In holding that the tax was void, the Court said:

"It has often been recognized that 'even interstate business must pay its way' by bearing its share of local tax burdens * * * and that in consequence not every local tax laid upon gross receipts derived from participation in interstate commerce is forbidden. * * * But it is enough for present purposes that under the commerce clause, in the absence of congressional action, state taxation, whatever its form, is precluded if it discriminates against interstate commerce or undertakes to lay a privilege tax measured by gross receipts derived from activities in such commerce which extend beyond the territorial limits of the taxing state. Such a tax, at least when not apportioned to the activities carried on within the state * * *, burdens the commerce in the same manner and to the same extent as if the exaction were for the privilege of engaging in interstate commerce and would, if sustained, expose it to multiple tax burdens, each measured by the entire amount of the commerce, to which local commerce is not subject.

\* \* \* \* \* \*

"There has been left to the states wide scope for taxation of those engaged in interstate commerce, extending to the instruments of that commerce, to net income derived from it, and to other forms of taxation not destructive of it."

As we understand the decision, the tax was held to be void because (1) it undertakes to "lay a privilege tax measured by gross receipts derived from activities in

commerce which extend beyond the territorial limits of the taxing state," and (2) it would expose the interstate commerce "to multiple tax burdens, each measured by the entire amount of commerce, to which the local commerce is not subject."

The former reason for holding the tax void, the long established rule before Western Live Stock, seems to apply equally to this case.

The City of New York adopted a local law which laid a tax upon purchasers of personal property at the rate of two percent on the price of every sale made in the city, which the seller was compelled to collect. The respondent was a Pennsylvania corporation engaged in the production of coal which it shipped by rail to a dock in Jersey City, and from there delivered it by barge to purchasers in New York City, in fulfilling orders given its local agent at its office in the city. In holding that the tax did not unduly burden interstate commerce, the Supreme Court in Mc-Goldrick v. Berwind-White Coal Mining Co., 309 U.S. 33, 60 S.Ct. 388, 392, 84 L.Ed. 565, 128 A.L.R. 876, said:

"* * * But it was not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax burdens, merely because an incidental or consequential effect of the tax is an increase in the cost of doing the business. * * * Not all state taxation is to be condemned because, in some manner, it has an effect upon commerce between the states, and there are many forms of tax whose burdens, when distributed through the play of economic forces, affect interstate commerce, which nevertheless. fall short of the regulation of the commerce which the Constitution leaves to Congress. * * *

"Certain types of tax may, if permitted at all, so readily be made the instrument of impeding or destroying interstate commerce as plainly to call for their condemnation as forbidden regulations. Such are the taxes already noted which are aimed at or discriminate against the commerce or impose a levy for the privilege of doing it, or tax interstate transportation or communication or their gross earnings, or levy an exaction on merchandise in the course of its interstate journey.

"* * * It is true that a state tax upon the operations of interstate commerce measured either by its volume or the gross receipts derived from it has been held to infringe the commerce clause, because the tax if sustained would exact tribute for the commerce carried on beyond the boundaries of the taxing state, and would leave each state through which the commerce passes free to subject it to a like burden not borne by intrastate commerce."

See "New Light on Gross Receipts Taxes. The Berwind case," 53 Harvard Law Review, p. 909, by Thomas Reed Powell.

Only the statement that "it was not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax burdens," lends color to appellee's claim which appears to be exceedingly unsubstantial in view of the further statement that, "A state tax upon the operations of interstate commerce measured either by its volume or the gross receipts derived from it has been held to infringe the commerce clause * * *."

The Chief Justice, with the concurrence of Mr. Justice McReynolds and Mr. Justice Roberts, was of the opinion that the tax was a direct burden on interstate commerce. But the Court held otherwise, because "The ultimate burden of the tax, both in form and in substance, is thus laid upon the buyer * * * and measured by the sales price. * * * It is conditioned upon events occurring within the state, either transfer of title or possession of the purchased property, or an agreement within the state, 'consummated' there, for the transfer of title, or possession."

Iowa's use tax was held by that state's Supreme Court to be unconstitutional if applied to sales made through orders for goods mailed in Iowa to appellee's store outside the state, paid for outside the state and shipped to the purchaser from outside the state. Sears, Roebuck & Co. v. Roddewig, 228 Iowa 1273, 292 N.W. 130. But the Supreme Court of the United States held otherwise, Nelson v. Sears, Roebuck & Co., 312 U.S. 359, 61 S.Ct. 586, 589, 85 L.Ed. 888, 132 A.L.R. 475. The respondent had retail stores in Iowa, as well as in other states. In holding the tax constitutional the Court said:

"Iowa may rightly assume that they are not unrelated to respondent's course of business in Iowa. They are none the less a part of that business though none of respondent's agents in Iowa actually solicited or placed them. Hence to include them in the global amount of benefits which respondent is receiving from Iowa business is to conform to business facts. * * *

"The fact that under Iowa law the sale is made outside of the state does not mean that the power of Iowa 'has nothing on which to operate.' Wisconsin v. J. C. Penney Co., supra [311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267, 130 A.L.R. 1229]. The purchaser is in Iowa and the tax is upon use in Iowa. The validity of such a tax, so far as the purchaser is concerned, 'has been withdrawn from the arena of debate.' Henneford v. Silas Mason Co., 300 U.S. 577, 583, 57 S.Ct. 524 527, 81 L.Ed. 814."

The Supreme Court of the United States in McLeod v. J. E. Dilworth Co., 322 U.S. 327, 64 S.Ct. 1023, 1026, 88 L.Ed. 1304, differentiated between a sales tax and a use tax. If it should appear, as it did to Mr. Justice Roberts in his dissent,

that the tax was a direct burden on interstate commerce, the majority did not so appraise it. We are not here concerned with a "use tax," but a "sales tax."

"They are different in conception, are assessments on different transactions, and in the interlacings of the two legislative authorities within our federation may have to justify themselves on different constitutional grounds." McLeod v. J. E. Dilworth Co., supra.

Appellee cites Wisconsin v. J. C. Penney Co., 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267, 130 A.L.R. 1229. The tax there held valid was an income tax. The case is of no assistance to us in making a decision on the present question.

The appellee cites Northwest Airlines v. Minnesota, 322 U.S. 292, 64 S.Ct. 950, 88 L.Ed. 1283, 153 A.L.R. 245. In that case the Supreme Court held that a Minnesota property tax laid on a fleet of air planes used in interstate commerce was constitutional. The owner was a Minnesota corporation and the home port of the fleet was in Minnesota, and all the planes were in Minnesota at some time during the year. It was held that the situs for state taxation was in Minnesota. Chief Justice Stone dissented and Justices Roberts, Reed and Rutledge joined therein. They were of the opinion that taxes on vehicles of interstate transportation should be equitably apportioned among the states in which they were used in interstate commerce. The decision is not pertinent to the present inquiry.

In some cases it is held that the local incident, or incidents, in making sales in which interstate commerce is involved is sufficient to authorize the laying of a sales tax, or use tax, consistently with the Constitution.

The question in General Trading Co. v. State Tax Commission, 322 U.S. 335, 64 S.Ct. 1028, 1029, 88 L.Ed. 1309, was whether Iowa could collect a use tax from the Trading Co., a Minnesota corporation, on the basis of property bought from it in Iowa, but shipped from Minnesota to purchasers in Iowa for use and enjoyment there. The Trading Co. had a place of business in Iowa where the orders were accepted. In sustaining the tax the Court said: "The tax is what it professes to be—a nondiscriminatory excise laid on all personal property consumed in Iowa. The property is enjoyed by an Iowa resident partly because the opportunity is given by Iowa to enjoy property no matter whence acquired. The exaction is made against the ultimate consumer—the Iowa resident who is paying taxes to sustain his own state government."

A more difficult case to understand is International Harvester Co. v. Department of Treasury of Indiana, 322 U.S. 340, 64 S.Ct. 1019, 1020, 88 L.Ed. 1313. The

question is whether the Indiana gross income tax could be laid consistently with the Federal Constitution, in the following cases:

"Class C: Sales by branches located outside Indiana to dealers and users residing in Indiana. The orders were solicited in Indiana and the customers took delivery to themselves at the factories in Indiana to save time and expense of shipping.

"Class D: Sales by branches located in Indiana to dealers and users residing outside of Indiana, in which the customers came to Indiana and accepted delivery to themselves in this state.

"Class E: Sales by branches located in Indiana to dealers and users residing in Indiana, in which the goods were shipped from points outside Indiana to customers in Indiana, pursuant to contracts so providing."

The appellants were foreign corporations authorized to do business in Indiana. They were manufacturers of machinery; and had manufacturing plants in adjoining states. They sold their merchandise in Indiana and other states. The Court said: "When Indiana lays hold of that transaction and levies the tax on the receipts which accrued from it, Indiana is asserting authority over the fruits of a transaction consummated within its borders. These sales, moreover, are sales of Indiana goods to Indiana purchasers."

Because the agreement to sell, and the delivery of Class D sales took place in Indiana, it was held that, "those events would be adequate to sustain a sales tax by Indiana." The tax on the Class E sales was held constitutional upon the authority of Allied Mills v. Department of Treasury, 318 U.S. 740, 63 S.Ct. 666, 87 L.Ed. 1120, affirming the same case, 220 Ind. 340, 42 N.E.2d 34. As to each class, it was held that the local events or transactions stated in the classifications were adequate factors upon which the Indiana sales tax might constitutionally rest. The Court in sustaining the tax said:

"The present tax, to be sure, is on the seller. But on each a local transaction is made a taxable event and that event is separate and distinct from the transportation or intercourse which is interstate commerce. In neither does the tax aim at or discriminate against interstate commerce.

" * * * The consummation of the transaction was an event within the borders of Indiana which gave it authority to levy the tax on the gross receipts from the sales. And that event was distinct from the interstate movement of the goods and took place after the interstate journey ended.

\* \* \* \* \* \*

"We only hold that where a State seeks to tax gross receipts from interstate trans-

actions consummated within its borders its power to do so cannot be withheld on constitutional grounds where it treats wholly local transactions the same way. Such 'local activities or privileges' (citing the Berwind-White case) are as adequate to support this tax as they would be to support a sales tax. To deny Indiana this power would be to make local industry suffer a competitive disadvantage."

It would seem that these conclusions are not different from those reached in Southern Pacific Co. v. Gallagher, 306 U.S. 167, 59 S.Ct. 389, 83 L.Ed. 586, in which the California use tax was assailed as violating the commerce clause.

At this point of time in the chronology of decisions on the question of the state's authority to tax interstate commerce, it had become a serious question whether the Supreme Court had discarded the rule that the commerce clause in itself was a bar to all direct taxation of interstate commerce. See Law Review articles cited. That rule had been reaffirmed in Di Santo v. Pennsylvania, 273 U.S. 34, 47 S.Ct. 267, 268, 71 L.Ed. 524. The court said: "The soliciting of passengers and the sale of steamship tickets and orders for passage between the United States and Europe constitute a well-recognized part of foreign commerce. * * * A state statute which by its necessary operation directly interferes with or burdens foreign commerce is a prohibited

regulation and invalid, regardless of the purpose with which it was passed."

But Mr. Justice Stone in dissenting stated: "In this case the traditional test of the limit of state action by inquiring whether the interference with commerce is direct or indirect seems to me too mechanical, too uncertain in its application, and too remote from actualities, to be of value. In thus making use of the expressions, 'direct' and 'indirect interference' with commerce, we are doing little more than using labels to describe a result rather than any trustworthy formula by which it is reached."

Later Mr. Justice Stone wrote the unanimous opinion of the Court in California v. Thompson, 313 U.S. 109, 61 S.Ct. 930, 85 L.Ed. 1219, which overruled the Di Santo decision; and held that where Congress had not acted, the states might enact police regulations that directly affected interstate commerce.

But the ancient and battered dogma was apparently resuscitated in Freeman v. Hewit, 329 U.S. 249, 67 S.Ct. 274, 276, 91 L.Ed. ——, and therein restored to its former standing as a bar to state taxation. A trustee domiciled in Indiana owned listed securities which he sent to New York to his broker to be sold on the New York Stock Exchange. They were sold for some $65,000 and the proceeds, less expense of sale, were remitted to the trustee in Indiana, upon which the State imposed a sales

tax. The reason for holding the tax void under the commerce clause was stated as follows:

"Our starting point is clear. In two recent cases we applied the principle that the Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an area of trade free from interference by the States. In short, the Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States. (Citation.) In so deciding we reaffirmed upon fullest consideration, the course of adjudication unbroken through the Nation's history. * * *

"State taxation falling on interstate commerce, on the other hand, can only be justified as designed to make such commerce bear a fair share of the cost of the local government whose protection it enjoys. But revenue serves as well no matter what its source. To deny to a State a particular source of income because it taxes the very process of interstate commerce does not impose a crippling limitation on a State's ability to carry on its local function. Moreover, the burden on interstate commerce involved in a direct tax upon it is inherently greater, certainly less uncertain in its consequences, than results from the usual police regulations. * * *

"It cannot justify what amounts to a levy upon the very process of commerce across State lines by pointing to a similar hobble on its local trade. * * *

"To extract a fair tithe from interstate commerce for the local protection afforded to it, a seller State need not impose the kind of tax which Indiana here levied. As a practical matter, it can make such commerce pay its way, as the phrase runs, apart from taxing the very sale. * * *"

There follow many illustrations of indirect taxes on interstate commerce, which may be constitutionally levied by the states; then follows:

"These illustrative instances show that a seller State has various means of obtaining legitimate contribution to the cost of its government, without imposing a direct tax on interstate sales. While these permitted taxes may, in an ultimate sense, come out of interstate commerce, they are not, as would be a tax on gross receipts, a direct imposition on that very freedom of commercial flow which for more than a hundred and fifty years has been the ward of the Commerce Clause. * * *

"Nor is there any warrant in the constitutional principles heretofore applied by this Court to support the notion that a state may be allowed one single-tax-worth of direct interference with the free flow of commerce. An exaction by a State from interstate commerce falls not because of a

proven increase in the cost of the product. What makes the tax invalid is the fact that there is interference by a State with the freedom of interstate commerce. * * *

"Taxes which have the same effect as consumption taxes are properly differentiated from a direct imposition on interstate commerce, such as was before the Court in the Adams case [Adams Mfg. Co. v. Storen, 304 U.S. 307, 58 S.Ct. 913, 82 L.Ed. 1365, 117 A.L.R. 429] and is now before us. The tax on the sale itself cannot be differentiated from a direct unapportioned tax on gross receipts which has been definitely held beyond the State taxing power ever since Fargo v. Michigan, 121 U.S. 230, 7 S.Ct. 857, 30 L.Ed. 888."

There are indications in the opinion and in the dissent that the Court had become worried over the fate of the commerce clause, which had been nibbled away by ingenious taxes laid by the states and held valid by that Court. The Court said: "* * * We reaffirmed (in Arizona and Virginia cases), upon fullest consideration, the course of adjudication unbroken through the Nation's history * * *" that is, the dogma that interstate commerce cannot be directly taxed. The concurring opinion of Mr. Justice Rutledge makes it quite clear that the Court could have decided the question on other grounds and that it took the occasion to return to the direct tax doctrine, if it had in fact departed from it.

It was held in Puget Sound Stevedoring Co. v. State Tax Commission, 302 U.S. 90, 58 S.Ct. 72, 82 L.Ed. 68, that the business of the company, in so far as it consisted of the loading and discharge of cargoes by longshoremen, subject to its own direction and control, is interstate or foreign commerce; that the State of Washington was not at liberty to tax the privilege of doing it by exacting in return therefor a percentage of the gross receipts. The exact question was before that court in Joseph, Comptroller v. Carter & Weekes Stevedoring Co., 67 S.Ct. 815, 819, 91 L.Ed. ——. It was contended by the petitioner that the reasons which underlay the Puget Sound decision were no longer controlling in view of Western Live Stock, Berwind-White and other decisions named in the opinion; that the ship loadings were local incidents or taxable events that brought such case within International Harvester Co. v. Department of Treasury, supra, and other cases hereinbefore reviewed. But the Court thought differently, "* * * The selection of an intrastate incident as the taxable event actually carries a similar threat to the commerce but, where the taxable event is considered sufficiently disjoined from the commerce, it is thought to be a permissible state levy. This result generally is reached because the local incident selected is one that is essentially local and is not repeated in each taxing unit. * * *"

The Hewit case was cited approvingly, and Western Live Stock, Gallagher, and other cases were reviewed and distinguished. The Court said: "Stevedoring is more a part of the commerce than any of the instances to which reference has just been made. Although state laws do not discriminate against interstate commerce or in actuality or by possibility subject it to the cumulative burden of multiple levies, those laws may be unconstitutional because they burden or interfere with commerce. (Citation.) Stevedoring, we conclude, is essentially a part of the commerce itself and therefore a tax upon its gross receipts or upon the privilege of conducting the business of stevedoring for interstate and foreign commerce, measured by those gross receipts, is invalid. We reaffirm the rule of Puget Sound Stevedoring Company: 'What makes the tax invalid is the fact that there is interference by a State with the freedom of interstate commerce.'"

The questions decided in International Harvester Co. v. Evatt, 329 U.S. 416, 67 S.Ct. 444, 91 L.Ed. ——, and Independent Warehouses v. Scheele, 67 S.Ct. 1062, 91 L.Ed. ——, cited by counsel, are different and the decisions are not of material assistance.

A correct understanding of the legal import of any of these decisions cannot be obtained from isolated statements or reasoning found in the opinion apart from their particular facts. Thus the statement that "Interstate commerce should bear its fair share of the burden of state taxation," is no doubt correct; but the burden can only be laid through the operation of a constitutional statute. A direct tax on gross income as a means to that end is denied to the states. Any uncertainty caused from Western Live Stock and other cases herein reviewed is set at rest by the decisions in the Freeman and Joseph cases.

We conclude from these decisions:

(1) The states cannot lay a direct tax on interstate commerce or gross receipts therefrom. Fisher's Blend Station v. Tax Commission, supra; Puget Sound Stevedoring Co. v. State Tax Commission, supra; Gwin, White & Prince v. Henneford, supra; Freeman v. Hewit, supra.

(2) There are various means of taxing interstate commerce by indirection so that it will bear its just share of state taxation. Freeman v. Hewit, supra.

(3) If an intrastate incident is sufficiently disjoined from interstate commerce though indirectly a burden thereon, it may be a "taxable event," open to state taxation, if it does not discriminate against interstate commerce. Western Live Stock v. Bureau of Revenue, supra; McGoldrick v. Berwind-White Coal Mining Co. supra; Nelson v. Sears, Roebuck & Co. supra; Wisconsin v. J. C. Penney Co. supra; General Trading Co. v. Tax Commission supra;

International Harvester Co. v. Department of Treasury supra; Department of Treasury v. Allied Mills supra; Southern Pacific Co. v. Gallagher, supra.

(4) A valid state tax may be levied upon intrastate communications though the facilities used are also used in interstate commerce. Ratterman v. Western Union Tel. Co., 127 U.S. 411, 8 S.Ct. 1127, 32 L.Ed. 229.

The appellant is engaged in three classes of broadcasting, two of which are described in the findings of the Court, as follows:

1. "Network programs supplied by national network broadcasting companies through the State of New Mexico on the interstate wires of the American Telephone and Telegraph Company, which wires are tapped by KOB at Albuquerque. These chain broadcasting companies programs so transmitted and tapped originate in studios maintained in other states and countries.

\* \* \* \* \* \*

"The program is thereupon delivered by a voice into the microphone of NBC in its studio in New York, Hollywood, or elsewhere outside the state of New Mexico. KOB receives the voice's message over interstate telephone wires from the studio outside the state, and by the turning of a switch, connects the interstate telephone wire with the mechanical facilities of KOB. The program, including the advertisers' message, goes out on the ether and is re-layed and amplified and broadcast by the broadcasting facilities of KOB.

2. "National spot advertising which is a program supplied by national advertisers and reaches the studio of the plaintiff for broadcast by means of transcription from outside of New Mexico, or by phonograph records or transcriptions transmitted in interstate commerce from other states to the KOB studio for broadcasting."

 These programs are thus broadcast over sixteen states and parts of Canada and Mexico. They are communications directed to all persons listening to the broadcasts wherever they may be. This business is strictly interstate and we can discover no incident. in connection therewith that could be classed as a "taxable event." The idea that there are means by which the state can lay a tax on these activities so that appellant will be required to pay "its just share of state taxation" in return for the protection it receives, is either a delusion, or else we are unable to discover the means through which it may be required to respond, in view of Freeman v. Hewit. We are of the opinion that the tax so laid and collected on the gross receipts from these broadcasts. must be returned to appellant.

 The third class of broadcasts is described in the findings as "Local advertising broadcasts which originate locally in the studio of KOB at Albuquerque but are heard in all sixteen states." It is a matter

of common knowledge that most, if not all of such broadcasts are local advertising of merchandise or other businesses that are of interest only to local people, notwithstanding such broadcasts may be heard by people in other states not interested in the advertising. Such also are broadcasts of local political parties and candidates, addressed to the state's electorate. It is only the fact that the range of radio, unlike communications by telegraph or telephone, is limited only by the power employed in broadcasting, that it may be heard by people to whom the message is of no interest. As a practical matter this business is intrastate.

We are aware that there are authorities holding otherwise, United States v. American Bond & Mortgage Co., D.C., 31 F.2d 448; Atlanta v. Atlanta Journal Co., 186 Ga. 734, 198 S.E. 788; Whitehurst v. Grimes, D.C., 21 F.2d 787. But if they are correct, then radio broadcasting, though the receipts and business are all intrastate, cannot be taxed, whether or not it transcends state lines. After all, it is the business that is the subject of taxation, and if the receipts of local broadcasting are from local people and the business obtained from such advertising is local; then the business is intrastate. Telegraph and telephone companies may be taxed on their intrastate business (Ratterman v. Western Union Tel. Co., supra) and radio should not be an exception.

The fact that Congress has taken control of the entire field of radio communications and broadcasting does not change the intrastate character of local broadcasting. The purpose is to protect interstate communications. The states cannot by establishing local rates, or by taxation of intrastate communications, or by any other means, unduly hamper interstate commerce. Pacific Tel. & Tel. Co. v. Tax Commission, 297 U.S. 403, 56 S.Ct. 522, 80 L.Ed. 760, 105 A.L.R. 1.

"* * * The execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere. * * *" United States v. American Bond & Mortgage Co., D.C., 31 F.2d 448, 455

We are of the opinion that local advertising by radio for local business is subject to the tax, (1) because it is intrastate business, and (2) in any event the advertising of local business to secure local patronage is a "taxable event" open to the states. Western Live Stock v. Bureau of Revenue, supra. The appellee should be permitted to retain the receipts collected from taxes laid on appellant's intrastate

business, the amount of which can be determined at another trial. Ratterman **v.** Western Union Tel. Co., supra.

The judgment is reversed and cause remanded with instructions to the district court to set aside its judgment, grant appellant a new trial, and proceed therein not inconsistent herewith.

It is so ordered.

LUJAN, SADLER, McGHEE, and COMPTON, JJ., concur.

On Motion for Rehearing

BRICE, Chief Justice.

On motion for rehearing the appellant asserts that this Court's opinion "is erroneous in one respect, to-wit:

"The Court held:

"We are of the opinion that local advertising by radio for local business is subject to the tax, (1) because it is intrastate business, and (2) in any event the advertising of local business to secure local patronage is a 'taxable event' open to the states."

The appellant contends first that the question of "whether a local advertising by radio can be segregated for the purpose of levying the tax assessed was not an issue below or in this court."

The legislature levied a tax equal to two percent of the gross receipts of the business of every person engaging or continuing in the business of conducting radio broadcasting stations (Sec. 76-1404, N.M.Sts. 1941); but it was specifically provided that "none of the taxes * * * shall be construed to * * * apply to any businesses or transactions exempted from taxation under the Constitution of the United States or the state of New Mexico," Sec. 76-1405, N.M. Sts.1941.

This act segregated for taxation all broadcasting that did not come within the constitutional inhibition, from that which did. The legislature never attempted to tax the gross receipts of appellant obtained from all broadcasting; but only that business which did not unduly burden interstate commerce, or which was not otherwise constitutionally inhibited.

Appellant brought this action to recover back from appellee approximately $25,000 paid by it under protest, on account of taxes levied against its gross income as a corporation engaged in the business of radio broadcasting. The burden was upon appellant to prove that it was entitled to the return of this money; and to that end must have secured findings of fact from the trial court that would support a judgment therefor. If it failed to establish that it was entitled to any portion of the funds claimed, then its case to that extent failed.

The findings of the Court are very explicit regarding interstate broadcasting. The pleadings as well as the findings segregate

the interstate business from the local business, except as to amount. It is admitted in the complaint, and found by the Court, that the appellant was engaged in "local advertising broadcasts which originate locally in the studio of KOB." There is nothing in the findings, or in the evidence for that matter to indicate that any of this local business is interstate. To that extent the appellant's case failed of proof, unless we must say that all broadcasting is interstate business, and to this we do not agree.

The appellant complains that this Court erred in its statement: "The third class of broadcasts is described in the findings as 'Local advertising broadcasts which originate locally in the studio of KOB at Albuquerque but are heard in all sixteen states.' It is a matter of common knowledge that most, if not all of such broadcasts are local advertising of merchandise or other businesses that are of interest only to local people, notwithstanding such broadcasts may be heard by people in other states not interested in the advertising. Such also are broadcasts of local political parties and candidates, addressed to the state's electorate. It is only the fact that the range of radio, unlike communications by telegraph or telephone, is limited only by the power employed in broadcasting, that it may be heard by people to whom the message is of no interest. As a practical matter this business is intrastate."

It is said that the statement is erroneous; and purported facts not in the record are stated by appellant in an attempt to prove the interstate character of the local broadcasting. In justification of this procedure it is said that our statement, just quoted, was outside the record. We may assume for this motion that the statement was too broad, but that is beside the case. The appellant admitted, and the Court found, that a part of the business was local advertising broadcasts originating locally in the studio of KOB; and in the absence of any finding other than this regarding the "local" portion of appellant's business, it has not met the burden of proof. We have held, and still hold, that the mere fact that local advertising is heard in other states, does not necessarily establish that it is an interstate transaction. The trial court concluded that "the business in which plaintiff is engaged is in part interstate commerce and part intrastate commerce," and to this we agree.

The burden was on the appellant to show that the whole tax was void. It segregated the taxable from its non-taxable activities in its pleadings and briefs, and sufficiently presented the question, for our consideration. Under similar facts the Supreme Court of the United States reached the same conclusion. Ratterman v. Western Union Tel. Co., 127 U.S. 411, 8 S.Ct. 1127,

32 L.Ed. 229. We are of the opinion that appellant did not establish its right to the return of funds collected as taxes on local broadcasting.

Answering other contentions, we state:

The legislature did not levy a tax that would unduly burden interstate commerce. Whether the parties contended in this Court or the Court below that either Court had jurisdiction to apportion the taxes, is immaterial. No attempt is made to apportion taxes. The activities of appellant that are not local are interstate. The appellant by its pleadings and the Court by its findings have segregated the taxable from the non-taxable, except as to amount, and that may be determined upon a new trial, which will be limited to a determination of the amount paid on local broadcasting. All other funds collected by appellee must be returned to appellant.

The cases cited by appellant have reference to gross receipts taxes which impose an unconstitutional burden on interstate commerce. Such is not the law here involved. The cases cited are: Adams Mfg. Co. v. Storen, 304 U.S. 307, 58 S.Ct. 913, 82 L.Ed. 1365, 117 A.L.R. 429; Freeman v. Hewit, 329 U.S. 249, 67 S.Ct. 274, 91 L. Ed. ——; Fisher's Blend Station Inc., v. Tax Commission, 297 U.S. 650, 56 S.Ct. 608, 80 L.Ed. 956; Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823, 115 A.L.R. 944; International Harvester Co. v. Evatt, 329 U.S. 416, 67 S. Ct. 444, 91 L.Ed. ——.

The motion for rehearing is denied, and it is so ordered.

LUJAN, SADLER, McGHEE, and COMPTON, JJ., concur.