65 P.(2d) 863

**WESTERN LIVE STOCK v. BUREAU OF REVENUE et al.**

No. 4210.

Supreme Court of New Mexico.

Feb. 22, 1937.

Frank H. Patton, Atty. Gen., for appellants.

D. A. Macpherson, Jr., of Albuquerque, for appellees.

SADLER, Justice.

The plaintiffs (appellees) sued in the district court of Santa Fé county to recover taxes in the sum of $80.27, paid under protest, imposed by the provisions of chapter 7 of N.M.Session Laws of 1934 (Special Session), based upon the receipts arising from certain advertising. Section 314 of the act extends authority to seek recovery by suit of taxes so paid on conditions therein named.

Judgment was rendered against defendants following their refusal to plead further upon entry of the trial court's order overruling a demurrer interposed by them to plaintiffs' amended complaint, hereinafter referred to as the complaint. They prosecute this appeal to secure a correction of the judgment claimed to be erroneous.

The essential facts, as disclosed by the complaint, are these. The plaintiffs are partners operating under the firm name of Western Live Stock. Their business is the publication of a trade journal or magazine at Albuquerque, N. M., known as

"Western Live Stock." It has a general circulation in New Mexico and other states. It is circulated by means of the United States mails, motortrucks, railroads, and express.

One of plaintiffs' sources of revenue is, of course, advertising. The magazine receives and publishes, under contracts, advertisements of products which are manufactured elsewhere than in New Mexico, such products to be sold, shipped, and transported from the manufacturer to the customer. These foreign advertisements are obtained by plaintiff both through personal solicitation and through what are known as advertising agencies, located in states other than New Mexico. Some of these advertising contracts are made between plaintiffs and the manufacturer, located in a foreign state, while others, as stated, are made between the plaintiffs and an advertising agency, such advertising agency having a different and a separate contract with the manufacturer, and in such cases all dealings in connection therewith are between the plaintiffs and the agency.

In the preparation of the advertisements for insertion in the plaintiffs' magazine, certain advertising cuts, mats, material, information, intelligence, and copy are sent to plaintiffs by said foreign advertisers, and plaintiffs receive compensation pursuant to the contract to carry the advertising from such foreign advertisers, and the receipts arising from such advertising contracts form the measure of the tax imposed in its application to plaintiffs.

This advertising is naturally designed to promote the sale of the advertised products. The advertising contracts so made with residents of other states require an interchange of correspondence between the advertiser and plaintiffs, contemplate the forwarding prior to publication of plats, cuts, mats, engravings, copy, and information from outside the state to plaintiffs within the state, as aforesaid, and the circulation and distribution of such magazines to subscribers and purchasers in New Mexico and other states.

The challenge to the act laid as a basis of recovery is, briefly, that the act, in the respect sought to be enforced against plaintiffs, violates section 8 of article 1 of the Constitution of the United States, known as the "Commerce Clause," by placing an unconstitutional burden on interstate commerce. The gist of the demurrer, likewise in brief, is that under the facts pleaded it does not.

The tax assailed is imposed by section 201 of said chapter 7, Special Session Laws of 1934, reading as follows: "There is hereby levied, and shall be collected by the Tax Commission, privilege taxes, measured by the amount or volume of business done, against the persons, on account of their business activities, engaging, or continuing, within the State of New Mexico, in any business as herein defined, and in the amounts determined by the application of rates against gross receipts, as follows:"

As applicable to plaintiffs the measure of the tax is prescribed by subparagraph I of

section 201, reading: "At an amount equal to two per cent of the gross receipts of any person engaging or continuing in any of the following businesses: * * * publication of newspapers and magazines (but the gross receipts of the business of publishing newspapers or magazines shall include only the amounts received for the sale of advertising space)."

The plaintiffs chiefly rest their argument supporting correctness of the trial court's ruling on the demurrer on certain state and federal cases, to wit: Post Printing & Publishing Co. v. Brewster (U.S.D.C.) 246 F. 321; State v. Salt Lake Tribune Pub. Co., 68 Utah, 187, 249 P. 474, 48 A.L.R. 553; Little v. Smith, 124 Kan. 237, 257 P. 959, 57 A.L.R. 100; International Text-Book Co. v. Pigg, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678, 27 L.R.A. (N.S.) 493, 18 Ann.Cas. 1103; Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co., 293 U.S. 268, 55 S.Ct. 182, 184, 79 L.Ed. 356, and the case of Fisher's Blend Station v. Tax Commission, 297 U.S. 650, 56 S.Ct. 608, 80 L.Ed. 956, decided March 30, 1936.

A careful analysis of these cases in the light of what is said in Blumenstock Brothers Advertising Agency v. Curtis Publishing Company, 252 U.S. 436, 40 S. Ct. 385, 387, 64 L.Ed. 649, and in Paul v. Virginia, 8 Wall. 168, 19 L.Ed. 357, and in other cases cited and relied upon in the Blumenstock Case, fails to persuade us that the advertising contracts themselves, although made between citizens of different states, are transactions in interstate commerce. That they are not so is the first point relied upon by the defendants for reversal. We rule the point in their favor. Indeed, the mere contracts are not commerce at all, neither intrastate nor interstate; no more so than contracts of insurance, and they have been held to be neither. New York Life Insurance Co. v. Deer Lodge County, 231 U.S. 495, 34 S. Ct. 167, 58 L.Ed. 332. Cf. Graniteville Mfg. Co. v. Query et al. (D.C.) 44 F.(2d) 64.

The Blumenstock Case, supra, was a suit by plaintiff, a Missouri corporation, against the defendant, a Pennsylvania corporation, to recover treble damages under the Sherman Anti-Trust Act (15 U.S.C.A. §§ 1–7, 15 note). Section 2 of said act (15 U.S. C.A. § 2) rendered unlawful any monopoly or attempt to monopolize any part of the trade or commerce among the several states. Section 7 of the same act (15 U.S.C.A. § 15 note) authorized the recovery of treble damages sustained by any person in his business or property by reason of anything forbidden or declared unlawful by the act. Sustaining the contention that the petition failed to state a cause of action, the court said:

"Commerce, as defined in the often quoted definition of Chief Justice Marshall, in Gibbons v. Ogden, 9 Wheat. 1, 189, 6 L.Ed. 23 [68] is not traffic alone; it is intercourse; 'it describes the commercial intercourse between nations and parts of nations in all its branches, and is regulated by prescribing rules for carrying on that intercourse.'

"In the present case, treating the allegations of the complaint as true, the subject-matter dealt with was the making of contracts for the insertion of advertising matter in certain periodicals belonging to the defendant. It may be conceded that the circulation and distribution of such publications throughout the country would amount to interstate commerce, but the circulation of these periodicals did not depend upon or have any direct relation to the advertising contracts which the plaintiff offered and the defendant refused to receive except upon the terms stated in the declaration. The advertising contracts did not involve any movement of goods or merchandise in interstate commerce, or any transmission of intelligence in such commerce."

The plaintiffs seek to distinguish this case by pointing out that in it the court was dealing with the case of a *refusal* to contract while here is presented the case of *completed* contracts. We see no point to the attempted distinction.

The opinions in Post Printing & Publishing Co. v. Brewster, supra, by the late Judge Pollock of the United States District Court in Kansas, State v. Salt Lake Tribune Pub. Co., supra, by the Supreme Court of Utah, and Little v. Smith, supra, by the Supreme Court of Kansas, carefully appraised, simply hold that state legislation which directly burdens an instrumentality of interstate commence—the publication and interstate circulation of newspapers as it happened to be in those cases—is unconstitutional. Each case involved a penal

statute prohibiting the advertising of cigarettes. Fundamentally, the decisions rest upon the interstate character of the business of the newspapers involved. That the publication and interstate circulation of newspapers is interstate commerce may not be questioned. Blumenstock Brothers Adv. Agency v. Curtis Pub. Co., supra; Konecky v. Jewish Press (C.C.A. 8th Ct.) 288 F. 179. But this fact alone does not draw all incidents of such a business within the protection of the interstate commerce clause of the Federal Constitution.

Expressions are to be found in some, if not all, of the three opinions first cited in the paragraph next above reflecting the idea that the advertising contracts themselves are transactions in interstate commerce. This view is directly contrary to the holding in the Blumenstock Case that they are not. It rejects the principle of New York Life Ins. Co. v. Deer Lodge County, supra, declaring mere contracts not commerce at all.

It is interesting to note that the Blumenstock Case had not been decided when Judge Pollock wrote his opinion in the Brewster Case. But it antedates the Salt Lake Tribune Case from Utah by six and one-half years and the decision of the Supreme Court of Kansas in Little v. Smith by more than seven years. Yet in neither of the last-mentioned cases is the decision in the Blumenstock Case noticed. Apparently, the court in neither of these cases had the benefit of that opinion, as certainly Judge Pollock did not in the Brew-

ster Case, in indicating a view that advertising contracts may be deemed transactions in interstate commerce.

In addition to the cases discussed, plaintiffs put great reliance upon two decisions of the United States Supreme Court already cited. They are Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co. and International Text-Book Co. v. Pigg. Indeed, plaintiff's counsel contends the former case, having been decided subsequently to the Blumenstock Case, overrules the latter to the extent of any conflict. When the real basis of the later decision is understood, we think there is no conflict.

The Indiana Farmer's Guide Case was another suit to collect treble damages under the Sherman Anti-Trust Act by reason of a violation of sections 1 and 2 of the act (15 U.S.C.A. §§ 1, 2). The plaintiff was the publisher of "The Indiana Farmer's Guide" at Huntington, Ind., having a circulation of 160,000, of which over two-thirds was in Indiana and approximately 50,000 in other states. The defendants, except Midwest Farm Paper Unit, Inc., were publishers of newspapers, general and not vocational in character, the names of such papers being calculated, however, to develop a circulation among farmers in the six midwestern states where published. The larger part of the circulation of each of these newspapers was in the state where published. Most of the advertisers in all the papers were located in states other than the state of publication, about 90 per cent. of petitioner's advertising coming from points outside Indiana. The combination in restraint of trade was claimed to be by virtue of an arrangement through the Midwest Unit, whose officers and agents were representatives of the other defendants. By virtue of this arrangement, a combination rate of advertising in all seven papers was much less than the total of separate charges for the same advertisement in any six.

In this case the court cites and discusses the Blumenstock Case, distinguishing it upon the ground that the subject matter there dealt with, as recited in the opinion in such case, "was the making of contracts for the insertion of advertising matter in certain periodicals belonging to the defendant"; whereas, said the court: "The business that is here alleged to have been damaged is the publication and circulation of these farm papers. That business includes the obtaining of advertising, the transportation between States of electrotypes sent respectively to petitioner and respondents by their customers to be used in setting up advertisements, and the transportation of substantial quantities of the papers in interstate commerce. Advertising at compensatory rates is an essential element. The opinion in Blumenstock Bros. Adv. Agency v. Curtis Pub. Co. [252 U.S. 436, 64 L.Ed. 649, 40 S.Ct. 385], supra, assumed that a publishing business such as that now under consideration would amount to interstate commerce. There is no ground for the contention that the evidence in this case is not sufficient to go to the jury on the question of interstate commerce." (Citations omitted)

In the case at bar, the subject matter dealt with is the validity of an act imposing a tax measured by receipts arising (in the instant case) from contracts by citizens of other states with plaintiffs for insertion of advertisements in their magazine published in New Mexico. The mere fact that the magazine has an interstate circulation does not give interstate character to the contracts. This was true of defendant's publications in the Blumenstock Case.

The substance of the material allegations in the petition in the Indiana Farmer's Guide Case as recited by the court in its opinion is: "that respondents entered into a contract, combination, and conspiracy *for the purpose of obtaining a monopoly of the farm paper business* including the publication, circulation, and distribution of advertisements of peculiar interest to farmers 'within the territory covered' by their publications; that in furtherance of this contract, combination and conspiracy they conceived a plan and design calculated to break down and destroy 'competition with other farm publications within said territory'; and that in order to effectuate that purpose they agreed upon a combination schedule of advertising rates for all their publications materially below the total of the separate rates of each." (Italics ours.)

The decisive allegation in this pleading is that which charges the doing of a thing declared unlawful by the Sherman Act, to wit, the entering "into a contract, combination and conspiracy for the purpose of ob-

taining a monopoly of the farm paper business * * * 'within the territory covered' by their publications." Publication and circulation of these farm papers throughout the several states mentioned concededly was interstate commerce. The fact that such business included advertising at compensatory rates, contracts in reference to which were the means employed to effectuate the unlawful conspiracy, did not give interstate character to such contracts, even though between citizens of different states. We do not understand the opinion so to hold. Nor can we see the significance attached by plaintiffs to the court's mention of the farm paper business as including transportation between states of electrotypes to be used by the respondents in setting up advertisements. While not questioning the interstate character of such transportation, it was but an incident to the performance of the advertising contracts. Obviously, it seems to us, the transportation of these articles did not, in the court's mind, give decisive characterization as interstate commerce to the business involved, for at the very outset the court deduced that from the interstate circulation of the farm papers.

The transportation between states of the electrotypes falls within the distinction we draw between the case at bar and International Text-Book Co. v. Pigg, also relied upon by plaintiffs. They argue that, even if such a contract as that disclosed in the Blumenstock Case be not deemed an interstate transaction, nevertheless the interstate movement of advertising cuts,

148

mats, and copy contemplated by their contracts with advertisers makes such contracts and the performance thereof interstate transactions within the doctrine of the Pigg Case.

But there is this difference between the two cases. In the Pigg Case the continuous movement of textbooks, apparatus, letters of instruction, and the like entered into the very essence of the contract. That movement was in constant execution and fulfillment of the contract itself—not a mere preliminary act incident to preparing one of the parties for performance as in the instant case. If plaintiffs be correct in this contention, a building contract between *two residents of New Mexico* for construction of a building *in New Mexico* will take on the characteristics of interstate commerce and be subject to federal regulation by the mere circumstance that the contract calls for material of a certain kind whose purchase and delivery may involve a movement of goods in interstate commerce.

Furthermore, in view of the dismissal of the petition in the Blumenstock Case for failure to state a cause of action for recovery of treble damages under the Sherman Act, we do not consider well founded plaintiffs' contention that advertising so promotes the sale of the goods advertised as to start their flow in interstate commerce, thereby characterizing same as an interstate transaction. Allegations of similar import appear in the petition in that case. This consideration seems too remote to be decisive and was evidently so

considered by the court in the Blumenstock Case.

The most that fairly can be said of the tax here imposed in its relation to plaintiffs' business, it seems to us, is that it indirectly affects interstate commerce. It is only such transactions as directly affect same and impose a direct burden thereon that fall within the interdiction of the commerce clause of the Federal Constitution. A. L. A. Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 850, 79 L.Ed. 1570, 97 A.L.R. 947, and cases cited. See, also, Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L. Ed. 1160.

In the Schechter Case, one ground urged in support of federal regulation of the live poultry industry of the metropolitan area in and about New York City was the power of Congress over interstate commerce. It was argued that hours and wages affect prices; that payment of lower wages or reducing cost by exacting long hours would enable the operator in the industry so doing to sell at lower prices, since labor represents 50 to 60 per cent. of these costs; that this practice results in a demand for a cheaper grade of goods; and that the cutting of prices demoralizes the price structure. Interstate commerce was thus brought in only upon the charge that violation of certain Code provisions regulating the industry—as to hours and wages of employees and local sales—*"affected"* interstate commerce.

Holding against the contention that the claimed violations directly "affected" interstate commerce, the court, among other things, said: "In determining how far the federal government may go in controlling intrastate transactions upon the ground that they 'affect' interstate commerce, there is a necessary and well-established distinction between direct and indirect effects. The precise line can be drawn only as individual cases arise, but the distinction is clear in principle. Direct effects are illustrated by the railroad cases we have cited, as, e. g., the effect of failure to use prescribed safety appliances on railroads which are the highways of both interstate and intrastate commerce, injury to an employee engaged in interstate transportation by the negligence of an employee engaged in an intrastate movement, the fixing of rates for intrastate transportation which unjustly discriminate against interstate commerce. But where the effect of intrastate transactions upon interstate commerce is merely indirect, such transactions remain within the domain of state power. If the commerce clause were construed to reach all enterprises and transactions which could be said to have an indirect effect upon interstate commerce, the federal authority would embrace practically all the activities of the people, and the authority of the state over its domestic concerns would exist only by sufferance of the federal government. Indeed, on such a theory, even the development of the state's commercial facilities would be subject to federal control."

At most, the tax challenged affects only indirectly the interstate business of plaintiffs. So does the property tax they pay on tangible property located in New Mexico; and as well the property tax paid by an interstate carrier on its property having permanent situs in the taxing state, even though employed in interstate transportation of freight and passengers. But no more in the one case than in the other does this indirect burden relieve such property from bearing its just share of state taxation.

That the Legislature did not intend to transcend provisions of the commerce clause of the Federal Constitution is shown by express language of the act. Section 202 of chapter 7 thereof reads: "None of the taxes levied by this act shall be construed to apply to transaction[s] in interstate or foreign commerce, or commerce with the Indian tribes."

We are not convinced that the act in its application to plaintiffs imposes an unconstitutional burden on interstate commerce. Controlled as we are by decisions of the United States Supreme Court on such matters, we have carefully weighed decisions cited from that court and believe our conclusion in harmony with them.

It follows that the trial court erred in overruling the demurrer of the defendants. Accordingly, the judgment entered against them following their refusal to plead further will be reversed. The cause will be remanded to the district court of Santa

Fé county, with directions to sustain the demurrer and for further proceedings in conformity with the views herein expressed.

It is so ordered.

HUDSPETH, C. J., and BICKLEY, BRICE, and ZINN, JJ., concur.