548 P.2d 95

**ADVANCE SCHOOLS, INCORPORATED,**
Appellant,

v.

**BUREAU OF REVENUE, Appellee.**

**No. 1754.**

Court of Appeals of New Mexico.

Nov. 25, 1975.

Certiorari granted Dec. 30, 1975.

Robert M. Dixon, Ortega, Snead, Dixon & Hanna, Albuquerque, for appellant.

Toney Anaya, Atty. Gen., Jan E. Unna, Bureau of Revenue, Asst. Atty. Gen., Santa Fe, for appellee.

**134**

OPINION

LOPEZ, Judge.

This case involves an Illinois-based correspondence school which sells courses in New Mexico. The school contends that it should not be subject to New Mexico's Gross Receipts Tax. Sections 72–16A–3 and 72–16A–4, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1973). The Commissioner of Revenue found contrary to the taxpayer's position and it is from his decision that this appeal is taken. We affirm.

The school is incorporated in Delaware and has its principal office in Illinois. "Drummers" in New Mexico contact students and present enrollment applications and financing information. The papers are sent to a regional office and then forwarded to the Chicago office for acceptance. Once enrolled the students receive materials from Illinois, lessons are returned to Illinois for grading and the students' further contacts are with personnel in the Illinois office.

New Mexico imposes its gross receipts tax on receipts received from selling property or performing services in New Mexico. Section 72–16A–3, supra. The Bureau contends that the school sells "property" in New Mexico. The school argues that it sells "services" and that these services are performed in Illinois.

"Property" is defined in the Gross Receipts and Compensating Tax Act as including tangible personal property. Section 72–16A–3(I), supra. "Service" is defined as ". . . all activities engaged in for other persons for a consideration, which activities involve primarily the performance of a service as distinguished from selling property." Section 72–16A–3(K), supra. There is no well accepted means of drawing the distinction between property and services in the tax area despite many years of experience with it. See, Hellerstein, The Scope of the Taxable Sale Under Sales and Use Tax Acts: Sales as Distinguished From Services, 11 Tax L.Rev. 261 (1955).

*Evco v. Jones,* 81 N.M. 724, 472 P.2d 987 (Ct.App.1970); rev'd on other grounds, 409 U.S. 91, 93 S.Ct. 349, 34 L.Ed.2d 325 (1972), established that the sale of the instructional materials themselves is to be treated as a sale of property.

■ *Evco* established that New Mexico does not look to the "predominant ingredient" (for explication of this concept see Hellerstein at 275–76; *Washington Times-Herald v. District of Columbia,* 94 U.S.App.D.C. 154, 213 F.2d 23 (1954); *Community Telecasting Service v. Johnson,* 220 A.2d 500 (Me.1966)), nor "community appraisal" test (See Hellerstein at 276–281) to determine whether a transaction involves a sale of goods or services. The question left unresolved by *Evco* is how a sale of property accompanied by a sale of services is to be treated. The taxpayer did not attempt to show that the contract price could be broken down into separate amounts for the tangible property and for the services provided. The Commissioner found that ". . . the services rendered by the taxpayer had only negligible and incidental value, if any, to the typical customer. . . ." Our powers of review are restricted to determining whether the Commissioner applied the appropriate law and made findings supported by the evidence. Section 72–13–39(D), N.M.S.A.1953 (Repl. Vol. 10, pt. 2, Supp.1973).

Students enrolled in Advance receive lesson booklets, a binder for storing the lessons, and other educational materials such as equipment used in the field, film strips, and audio discs. As students complete one lesson package, the computer directs that another be sent. Students generally take two years to complete a course, and receive new lessons every three or four weeks.

The student's lesson cards are mailed to a computer for grading. The computer indicates the right answer and the student's grade. When a failing grade is received, the student is told to restudy the material. Some courses, such as drafting, are graded by hand.

Whenever a lesson has not been returned within twenty-eight days of the last one, the computer sends a letter in which the school inquires about the student's tardiness. Students with questions about the educational materials can mail in a consultation blank, provided for that purpose, or telephone toll free, and receive the aid of an instructor at the school. The courses are designed to cause a minimum amount of student difficulties, so that the necessity for student inquiries can be lessened. The computer grading system allows the school to constantly revise lesson materials which the computer indicates that students are not absorbing.

The ratio of certified teachers to students is 30 teachers to 72,000 students. In addition to the teaching faculty, the school has a research and development staff which prepares the course materials. The school grades 250,000 to 300,000 lessons per month.

In addition to this general sort of information about the school, the school introduced the records of two typical students. The correspondence consisted of motivational letters from the school and letters from one of the students regarding errors in the materials.

■ The taxpayer's description of the services provided by the school and the students' records provide substantial evidence to support the Commissioner's finding that the primary activity of the taxpayer was selling the materials and that any services provided were incidental to these sales. See *Cardinal Fence Co., Inc. v. Commissioner of the Bureau of Revenue*, 84 N.M. 314, 502 P.2d 1004 (Ct.App.1972) (Sutin, J., dissenting).

In holding that this school sold property and did not provide services within the meaning of these terms as used in the Gross Receipts Act, we are not establishing any broad holding with regard to every school which might be denominated a "correspondence school". There are many models of nonresidential instruction which might involve more intercourse with the school than the initial purchase of educational materials. Nor do we intend to discriminate between correspondence and residential schools. New Mexico residential schools could be viewed as providing services in New Mexico and therefore subject to tax under the Gross Receipts Act.

■ The taxpayer also argues that this tax is unconstitutional because it violates the due process and commerce clauses of the United States Constitution. The test for the validity of a tax under both of these clauses is similar. *Hess v. Illinois,* 386 U. S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967).

In *Colonial Pipeline Co. v. Triangle,* 421 U.S. 100, 95 S.Ct. 1538, 44 L.Ed.2d 1 (1975), the Court stated that the framework established in *General Motors Corp. v. Washington,* 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964) is still controlling:

> " '[T]he validity of the tax rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special relation. For our purposes the decisive issue turns on the operating incidence of the tax. In other words, the question is whether the State has exerted its power in proper proportion to appellant's activities within the State and to appellant's consequent enjoyment of the opportunities and protections which the State has afforded. . . . As was said in *Wisconsin v. J. C. Penney Co.,* 311 U.S. 435, 444, 61 S.Ct. 246, 85 L.Ed. 267 (1940), "[t]he simple but controlling question is whether the state has given anything for which it can ask return." ' 377 U.S., at 440–441, 84 S.Ct. 1564, 12 L.Ed.2d 430."

A multitude of cases have specified the limits of the state's powers within this framework. The taxpayer compares its operations to those of the mail order house held immune from the use tax in *Hess v. Illinois,* supra. In *Hess* a mail order house with its principal place of business in Missouri protested Illinois' imposition of a use tax on Hess' sales to Illinois residents. The taxpayer's only contact with Illinois

consisted of sending catalogues and advertising "flyers" to prospective customers in Illinois. However, the caveat to the holding in *Hess* is clear from the case itself: ". . . the Court has never held that a State may impose the duty of use tax collection and payment upon a seller whose *only* connection with customers in the State is by common carrier or the United States mail. . . ." (Emphasis supplied)

The Court in *Scripto, Inc. v. Carson*, 362 U.S. 207, 80 S.Ct. 619, 4 L.Ed.2d 660 (1960), upheld a use tax imposed by Florida on sales to Florida customers by a foreign corporation. The foreign corporation had ten salesmen in Florida who solicited orders for the company; the orders were sent to the home office in Atlanta and accepted or rejected there. The Court found that the use of the property by Florida residents and the presence of the salesmen within the state were sufficient to uphold Florida's taxation.

Finally, in *Standard Pressed Steel Co. v. Washington Department of Revenue*, 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975), Mr. Justice Douglas, writing for a unanimous Court, sustained the imposition of Washington's tax on the gross receipts of a foreign corporation which had one salesman in Washington. The foreign corporation manufactured parts for Boeing Corporation and kept the salesman in Washington to consult with Boeing about its requirements. Boeing's orders were sent directly to the taxpayer's home office and were accepted or rejected there. Shipment was made from the home office and payment was made there. Using language particularly apt in our case, the Court concluded that the question of whether the state had given benefits ". . . verges on the frivolous. For appellant's [taxpayer's] employee, Martinson, with a full-time job within the State, made possible the realization and continuance of valuable contractual relations between appellant and Boeing."

In the case before us the taxpayer's activities within the state are substantial.

The taxpayer has in New Mexico as many as six salesmen, a sales manager, two secretaries, salaried telephone solicitors, two sales offices and advertisements in the yellow pages. The salesmen contact students, show sales films and present them with financing information and application forms. The taxpayer argues that students could break the obligation created by the applications if they did so within fifteen days, and that subsequent contractual transactions are with the Chicago office. *Scripto* and *Standard Pressed Steel Co.* teach that the noninvolvement of the salesman in the actual contract is irrelevant. Accord, *General Motors Corporation v. Washington,* supra.

The taxpayer also contends that this tax is unconstitutional because it is unapportioned. This contention was also discussed in *Standard Pressed Steel Co.*, where the Court noted that when a tax is imposed on gross receipts from sales to customers in the destination state, the tax is " 'apportioned exactly to the activities taxed' ." The real contention of the taxpayer is that this is a tax on services and thus must reflect an allowance for the services performed in Illinois. We have held in this opinion that only property has been taxed. It is the property versus services distinction which determines the power of the taxing state (See, *Evco v. Jones*, 409 U.S. 91, 93 S.Ct. 349, 34 L.Ed.2d 325 (1972); *Department of Treasury v. Ingram-Richardson Mfg. Co.*, 313 U.S. 252, 61 S.Ct. 866, 85 L.Ed. 1313 (1941) (state where services are performed can tax)) and the decision that only property was transferred is thus determinative of the constitutional limits of our taxing power.

The decision of the Commissioner is hereby affirmed.

IT IS SO ORDERED.

HENDLEY, J., concurs.

SUTIN, J., dissents.

SUTIN, Judge (dissenting).

I dissent.

There are two questions for decision in this case.

(A) Is there substantial evidence to support the Commissioner's Decision and Order?

(B) Was the Commissioner's Decision and Order unlawful under the Constitution?

(A) *Substantial evidence does not support the Commissioner's Decision and Order.*

ASI, an Illinois corporation, is engaged in business in Illinois as a correspondence school.

We must clear the picture of ASI's operations. ASI was not qualified to do business in New Mexico. It maintained two district offices here—one in Albuquerque which had one to three sales representatives, and one in Roswell which had one to three sales representatives. The district office called prospective students. If one was interested in studying one of ASI's courses, the representative called upon that student and explained the course in which the student was interested. If the student decided to enroll, the representative assisted the student in preparing an enrollment application and retail installment contract which were signed by the student, brought into the district office, checked for accuracy and sent to the Chicago office for acceptance. Attached to these papers was the student's check which covered a "use" tax and an insurance fee for the federally insured student loan program. Thereafter, the district offices faded from the scene.

After the retail installment contract was accepted, a copy was mailed to the student.

As a contract example, for a consideration of $1500, ASI furnished the student (1) a complete training course in a field selected by the student, (2) personal instruction by correspondence, (3) kits and materials, and (4) other benefits as described in current school literature.

After the contract was accepted, the whole program was serviced entirely by mail, telephone, and correspondence between ASI instructors in Illinois and the student in New Mexico. The educational kit and materials were all mailed to the student in New Mexico from the State of Illinois. When a student completed his course, the materials were his to keep.

The contract makes no provision for the "sale" of tangible personal property, nor for the performance of services in New Mexico. The only reference to a "sale" is that of the Bureau auditor. He testified that ASI paid a "gross receipts" tax, during the audit period, of $50 per student enrollment for the "sale" of the kit. There was no evidence to support this conclusion. ASI "gross receipts" tax returns were not produced from the Bureau files. The auditor received his information from the books of ASI and reported that ASI's total receipts were $143,605. This amount was received by ASI from the student's check as payment for the "compensating tax". Section 72–16A–7. This payment is shown on the retail installment contract as "Sales Tax—$2.00". This is a 4% tax upon the person *using* the $50 kit in New Mexico. It was this tax that ASI owed to the Bureau. It would amount to $5,744. The tax, penalty and interest are due on this transaction if ASI did not pay the tax. Whether we call it a "gross receipts" tax or a "use" tax is of little significance.

The gross receipts of $143,605, supra, were deducted from the total gross receipts which ASI received from students. This fact establishes that the tax was paid by ASI. This subtotal constituted the audit tax base. Upon this tax base, the Bureau assessed an additional tax of $51,132.93.

The only question for decision now is: Did the performance of the educational process under the retail installment contract constitute *a sale of property* in New Mexico under the Gross Receipts and Compensating Tax Act? Of course not. It constituted a "service" by mail and telephone between ASI in Illinois and students in New Mexico.

One of the purposes of the Gross Receipts and Compensating Tax Act is "to protect New Mexico businessmen from the unfair competition that would otherwise result *from the importation into the state of property . . . .*" [Emphasis added]. Section 72–16A–2. "Gross receipts" means "the total amount of money . . . received *from selling property in New Mexico,* . . . or from performing services in New Mexico . . . ." [Emphasis added]. Section 72–16A–3(F). ASI performs no services in New Mexico under its contract. To pay a gross receipts tax, ASI must engage in some business activity in New Mexico that results in *the sale of property* in this state. Sections 72–16A–3(E) and 72–16A–4.

Under the former "Emergency School Tax Act", the tax was a privilege tax "measured by the amount or volume of business done, against the persons, on account of their business activities, engaging or continuing within New Mexico, . . . ." Section 72–16–4.1, N.M.S.A. 1953 (Repl.Vol. 10, pt. 2). Under this section, "The receipts taxed were receipts based on *activities* within New Mexico." [Emphasis added]. *Bell Telephone Laboratories v. Bureau of Revenue,* 78 N.M. 78, 82, 428 P.2d 617, 621 (1966). The activity of a business in New Mexico is no longer taxable unless it results in a sale of property or the performance of a service.

Upon what basis did the Commissioner find that the performance of the correspondence school program constituted a "sale" of property in New Mexico?

Paragraph 4 of the Commissioner's Decision and Order reads:

4. During the reporting period the taxpayer *sold* tangible personal property in New Mexico and the proceeds therefrom were gross receipts within the meaning of § 72–16A–3(F), supra, *since the sale of such property was the principal objective of the contracting parties and the services rendered by the taxpayer outside this state had only negligible and incidental value, if any, to the typi-*

*cal customer.* This finding is in keeping with Bureau of Revenue G.R. Regulation 3(F):8 *which is presumed to be a proper implementation of the provisions of the statute.* Section 72–13–23 (G), N.M.S.A. 1953 (Supp.1973) [Laws of 1965, Chapter 248, § 1]. [Emphasis added].

This finding creates two problems: (1) Does the record show that "the sale of such property [the kit] was the principal objective of the contracting parties"? (2) Is Regulation 3(F):8 valid?

(1) *The "sale" of the property was not the principal objective of the parties.*

The test applied by the Commissioner, to distinguish the difference between a taxable sale of tangible personal property and a nontaxable service where a transaction occurs, was stated to be "the principal objective of the contracting parties". This is a new test under gross receipts tax law. To me, it is a good, realistic approach to the problem involved in a correspondence school transaction when the contract itself is considered. This matter appears to be one of first impression in the United States.

In .1956, two tests were referred to: (1) the "predominant ingredient" test. This is the "test of the 'insignificant' value of the materials in the light of the total charge" for the product. Under this test, the labor, skill, and artistry used in creating a product, such as a spoon, is a service rendered. The spoon is then sold. Was this a sale of property or a sale of services? Under this test, there is no separation of services rendered and the product sold. This test is not applicable here. (2) The "community appraisal" test. Under this test ". . . the area of taxable sale should be drawn at the point at which, by custom and tradition and community attitude, a transaction is regarded as buying and selling and not as the furnishing of services." This test is applicable. Hellerstein, The Scope of the Taxable Sale Under Sales and Use Tax Acts: Sales as Distinguished from Services, 11 Tax.L.Rev. 261, 274, 275,

282 (1956). The weakness of the "predominant ingredient" test was pointed out id. at 275.

Professor Hellerstein turned to another factor which influenced taxing authorities. This factor is employed in a transaction which involves *both* a delivery of property *and* the rendition of services. This factor is determined by ". . . whether the product delivered is all the customer receives, or whether, in addition, there are services going *along with* the article." [Emphasis by author]. Id. at 283, 284. In this situation, where the substance of the transaction is a sale of the article and the services rendered are incidental, the transaction is taxable as a sale. "Where, however, the service is regarded as the primary factor and the accompanying article minor and incidental thereto . . . it appears appropriate to classify the transaction as a service." Id. at 285, 286. This factor falls within the definition of "service" in § 72–16A–3(K). It reads:

"service" means all activities engaged in and for other persons for a consideration, which activities involve primarily the performance of a service as distinguished from selling property.

Both parties disagree on the applicability of the "community appraisal" test in New Mexico under *Evco v. Jones,* 81 N.M. 724, 472 P.2d 987 (Ct.App.1970); 83 N.M. 110, 488 P.2d 1214 (Ct.App.1971), rev'd on other grounds, 409 U.S. 91, 93 S.Ct. 349, 34 L.Ed.2d 325 (1972). Hellerstein was referred to in this case. The Commissioner relies solely on *Evco v. Jones.*

Evco was engaged in business as a designer or creator of instructional or educational programs. It entered into contracts with agencies of the federal government and a university research foundation for the creation, production and delivery of reproducible originals of educational books, manuals, films, and magnetic audio tapes. The "essential ingredient" test was not adopted. The Court held that these items constituted sales of tangible personal property. Under § 72–16A–12.1, gross receipts from these sales to the federal government were exempt from the payment of a gross receipts tax.

The sole question presented was whether these contracts were for the performance of services to which the items of tangible personal property were merely incidental. The Court said "No." Its conclusion was as follows:

Thus, as we view *the principal objective of the agencies under their contracts,* it was to secure from the taxpayer the finished items, and these finished items cannot logically be said to be merely incidental to the performance of services. [Emphasis added]. [81 N.M. at 729, 472 P.2d at 992].

The reason given was that the finished items were essential so that *the agencies* could use them for "teaching, instructional and educational" purposes for which they were created.

The reasoning in *Evco* is illustrated as follows. In *Craig-Tourial Leather Co. v. Reynolds,* 87 Ga.App. 360, 73 S.E.2d 749, 752 (1952) a shoe repairman is engaged in rendering services, not selling materials. His duty was to render services in repairing the shoes because this was "the main consideration . . . of the customer . . . ." But where the customer wants "the finished items", not the services rendered, the transaction is a sale of property. *Evco v. Jones,* supra. For other cases which distinguish services from sales, see, *Booth v. City of New York,* 268 App. Div. 502, 52 N.Y.S.2d 135 (1944), aff'd, 296 N.Y. 573, 68 N.E.2d 870 (1946); *J. H. Walters & Company v. Department of Revenue,* 44 Ill.2d 95, 254 N.E.2d 485 (1969).

*Evco* differs from the instant case in the following respects:

(1) In *Evco,* the product sold was furnished by the taxpayer. Services were included in the creation of the product. The educational process was serviced by the agency to whom the product was sold. In

the instant case, education was serviced by and the product was "sold" by ASI to a student. This concept falls within the Hellerstein factor of "services going along with the article."

(2) In *Evco*, the test is "the principal objective of *the agencies* under their contracts". In the instant case, the test is "the principal objective of the contracting *parties*".

To me, it is clear that the "predominant ingredient" test is not applicable. The "community appraisal" test is applicable because this transaction would normally be regarded as furnishing services and not that of buying and selling property.

If we adopt the "community appraisal" test, the *Evco* test or the Commissioner's test, ASI educational services are not taxable.

The Commissioner cannot determine "the principal objective of the contracting parties" without reference to the contract. It alone establishes the principal objective, because in construing a contract, you ascertain the intent of the parties.

There is not a scintilla of evidence that the "sale" of the kit to students in New Mexico was "the principal objective" of the students, nor was the "sale" "the principal objective of the contracting parties". The gross receipts from students was insignificant when compared with the receipts from the educational program. The record is replete with ASI testimony and exhibits that the educational process was the principal objective of the students as well as that of ASI and the students. The ASI General Catalog 1974 was introduced into evidence by the Commissioner. He is bound by this evidence. It states on page 3:

> ASI's objectives are to study continuously the vocational and avocational needs of the public and to develop and provide, through correspondence, high-quality professional training in specific fields where guided independent study is useful.

Page 9 on Course Materials states:

> *Since coursework is based primarily on learning practical skills*, written materials are *supplemented* by color filmstrips, recordings, kits of actual professional working tools and equipment and other work-related study aids. [Emphasis added].

ASI had a faculty and staff of 49 members, composed of college graduates and certified instructors. It had eight professional consultants. Space does not allow a description of the school's vast educational programs, the methods used to perform these services, and the correspondence between the students and ASI. The services rendered was the students' and ASI's principal objectives. The "sale" of educational materials was only supplementary.

I agree with ASI that "It is only common sense that A.S.I.'s students' principal objectives are to learn something, and not to acquire the property used in the gaining of the knowledge sought."

The basic position of the Commissioner is that ASI is engaged in "selling" a product; that the product is accompanied by services that are only incidental. The reverse is true.

The Commissioner contends, for example, that ASI was primarily engaged in "selling" property because 24 different types of equipment of the value of $50, listed on pages 124 to 129 of the ASI General Catalog were sold to students. What the Commissioner does not disclose is that this equipment covers 96 lessons in radio and television service and repair which covers a period of study of 24 months equal to 1350 hours, or five semesters of home study under the direction and supervision of ASI faculty and staff. This is only one of eleven different courses offered to students and the longest course given.

The Commissioner's position omits consideration of the contract and the evidence in the record. "It is logical to assume that the parties to a contract know best what is meant by its terms, and that whatever is done by them during the performance of

the contract is consistent with their intent and the meaning of the contract terms as understood by them." *Schultz & Lindsay Construction Co. v. State*, 83 N.M. 534, 535, 494 P.2d 612, 613 (1972); *United States v. Bureau of Revenue*, 87 N.M. 164, 531 P.2d 212 (Ct.App.1975) (Hernandez, J., specially concurring).

It cannot be gainsaid that the educational services cannot be performed without the equipment, but does this mean that the activities of ASI do NOT "involve primarily the performance of a service"? My answer is "No!" ASI is not engaged in the business of selling property to students. It is engaged in the business of educating students. The property is supplemental, additional, or incidental to the process of education. See, *Cardinal Fence Co., Inc. v. Commissioner, Bur. of Rev.*, 84 N.M. 314, 320, 502 P.2d 1004 (Ct.App.1972) (Sutin, J., dissenting). There is no evidence that ASI "sells" its property to students at a profit to establish a "sales" business. A charge of $50 for a kit does not make a school a "sales" business. Neither is a university a "sales" business because it sells athletic tickets to students or because it charges them rent for housing.

The word "primarily" means "first of all", "fundamentally, principally". Webster's Third New International Dictionary (1966), at 1800. The history of ASI discloses that its business is "first of all", "to complement public education in supplying vocational, technical, and business training".

Under § 72–13–38(G), in hearings before the Commissioner, he must "render a decision in accordance with the law and the evidence presented and admitted."

We do not view the evidence in the light most favorable to the decision. Our duty is to look at the entire record. We can set aside the decision when we cannot conscientiously find that the evidence supporting that decision is substantial. *Gathings v. Bureau of Revenue*, 87 N.M. 334, 338, 533 P.2d 107 (Ct.App.1975) (Sutin, J., dissenting).

The Commissioner presented no evidence on the crucial point—that the "sale" of the kit was the principal objective of the contracting parties.

The Commissioner's Decision and Order is not sustained by substantial evidence.

(2) *The Commissioner's presumption of the application of Regulation 3(F):8 is erroneous.*

Regulation 3(F):8 provides in part:

Receipts of a correspondence school from selling correspondence courses to students in New Mexico are receipts from selling property in New Mexico and are subject to the gross receipts tax. Section 72–16A–3 (F), N.M.S.A.1953.

The Commissioner believes that his finding No. 4, supra, "is in keeping with Bureau of Revenue G.R. Regulation 3(F):8 which is presumed to be a proper implementation of the provisions of the statute."

Section 72–13–23 gives the Commissioner authority, by regulation, to "implement and enforce any provision of any law administered by the bureau. . . ." This means that by regulation, the Commissioner can "carry out" and enforce. "Implement" is a synonym for "enforce". Webster's Third New International Dictionary (1966), at 751. This statute does not delegate authority to the Commissioner to enact legislation which directly taxes a specific segment of business. His duty is to listen to all of the evidence presented in this case and then render a decision and order. Regulation 3(F):8 is void. *Rainbo Baking Co. of El Paso v. Commissioner of Rev.*, 84 N.M. 303, 502 P.2d 406 (Ct.App. 1972). But see *Markham Advertising Co. v. Bureau of Revenue*, 88 N.M. 176, 538 P. 2d 1198 (Ct.App.1975) where a regulation was used to show that the taxpayer did not stand alone among his competitors.

The Commissioner's presumption is erroneous.

(B) *ASI is also protected by the Commerce Clause.*

Section 72–16A–14.10 provides:

Receipts from transactions in interstate commerce may be deducted from gross receipts to the extent that the imposition of the gross receipts tax would be unlawful under the United States Constitution.

The record is clear that ASI's nexus with New Mexico was the presence of sales representatives in an office seeking only students interested in an educational course. From the time the contract was accepted in Illinois, all contacts thereafter were between ASI and the students. ASI was engaged in two activities: (1) providing New Mexico students with an educational program, and (2) furnishing New Mexico students with kits to use. These activities can be separated for purposes of taxation.

Receipts from a tax can be apportioned between in-state and out-of-state activity. We exclude from discussion the kits which were mailed for use by students during the educational course. This tax was paid for in-state activity. ASI was the collector of the use tax and was liable therefor. Section 72–16A–10. *General Trading Co. v. State Tax Commission,* 322 U.S. 335, 64 S.Ct. 1028, 88 L.Ed. 1309 (1944); *Scripto v. Carson,* 362 U.S. 207, 80 S.Ct. 619, 4 L. Ed.2d 660 (1960).

We are now confronted with a factual situation that is purely interstate commerce. Under what circumstances is interstate commerce taxable for gross receipts, money received by a foreign corporation in a foreign state for services rendered from that foreign state to students in another state?

"I am not at all satisfied that this Court's decisions of the past 30 years, some of them by sharply divided votes, are so plain and so analytically consistent as the Court's opinion would seem to imply." *Colonial Pipeline Co. v. Traigle,* 421 U.S. 100, 95 S.Ct. 1538, 44 L.Ed.2d 1, 12 (1975) (Blackmun, J., concurring opinion). In a dissenting opinion, Mr. Justice Stewart said: "I cannot understand how the Court can embrace the wholly specious reasoning of the Supreme Court of Louisiana in this case." [95 S.Ct. at 1547, 44 L.Ed.2d at 14]. See also, *B. F. Goodrich Co. v. State,* 38 Wash.2d 633, 231 P.2d 325 (1951). From *McLeod v. Dilworth Co.,* 322 U.S. 327, 64 S.Ct. 1023, 88 L.Ed. 1304 (1944) to *Colonial Pipeline Co.,* (1975), it requires clairvoyance to understand the ipse dixit statements made, the comparison of cases discussed, and the authorities cited for principles of law.

The majority of the Supreme Court of the United States have played chess with the minority to seek strategic moves by which states or interstate commerce may emerge victorious. By this process, states, when victorious, have been elevated to a power of taxation, unknown at the founding of this country. Due to the heavy financial burdens with which states have been confronted, the philosophy of the present members of that Court is to tear apart the words "interstate commerce" and to grant a state any avenue it desires to raise money via taxes, provided the foreign entity has any *property* contact with the state for any purpose.

New Mexico decisions which struggled with this problem are *Western Live Stock v. Bureau of Revenue,* 41 N.M. 141, 65 P.2d 863 (1937), 41 N.M. 288, 67 P.2d 505 (1937), aff'd, 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823, 115 A.L.R. 944 (1938); *Albuquerque Broadcasting Co. v. Bureau of Revenue,* 51 N.M. 332, 184 P.2d 416, 11 A. L.R.2d 966 (1947); *Seismograph Service Corp. v. Bureau of Revenue,* 61 N.M. 16, 293 P.2d 977 (1956); *Besser Company v. Bureau of Revenue,* 74 N.M. 377, 394 P.2d 141 (1964); *Bell Telephone Laboratories v. Bureau of Revenue,* supra; *New Mexico Newspapers, Inc. v. Bureau of Revenue,* 82 N.M. 436, 483 P.2d 317 (Ct.App.1971); *Evco v. Jones,* supra; *Spillers v. Commissioner of Revenue,* 82 N.M. 41, 475 P.2d 41 (Ct.App.1970); *Markham Advertising Co. v. Bureau of Revenue,* supra.

Two cases involved the taxation of foreign corporations—*Bell Telephone Laboratories* and *Seismograph Service Corp.*

Bell Telephone Laboratories was taxed under the Emergency School Tax Act. It was taxed upon local business activity which was separate and distinct from its interstate operations.

Seismograph was a Delaware corporation with its principal office and place of business in Oklahoma. It was principally engaged in the business of professional consultation upon geological and geophysical problems encountered by the oil industry throughout the United States. Its services were rendered under Oklahoma contracts with its clients, by which it agreed to furnish professional advice and corroborative information with regard to the subsurface geological formations of the earth's crust in any given area. Its contract fees were received from its clients in Oklahoma for professional advice and recommendations.

Seismograph made geophysical surveys for oil in New Mexico. The data was taken to its Oklahoma office for supervision and administration. The trial court denied the imposition of a tax. It found "That the local activity carried on by plaintiff in the State of New Mexico is an integral part of interstate processes and cannot be separated from it." [61 N.M. at 20, 293 P.2d at 979].

The Bureau contended that "The services rendered by the plaintiff were local and not interstate in character." [61 N.M. at 20, 293 P.2d at 979].

The trial court was affirmed. The Supreme Court held that Seismograph was not engaged in intrastate activity, even though its employees performed work in New Mexico. The Court said:

The record shows no means by which any part of the receipts of plaintiff can be definitely declared as receipts from operations in New Mexico. [61 N.M. at 26, 293 P.2d at 983].

*Seismograph* stands for the proposition that work performed in New Mexico by a foreign corporation is not taxable as intrastate activity where the work performed is an integral part of interstate processes or the corporation does not receive compensation from that work.

ASI falls squarely within *Seismograph*. ASI's employees made student "surveys" in New Mexico and sent their results to Illinois. The local activity carried on by ASI was an integral part of its interstate processes which followed and cannot be separated from it. After the contract was accepted, all receipts of ASI were paid in Illinois, not for the work of its sales representatives, but for services to be performed. The record shows no means by which any part of the receipts of ASI can be declared as receipts from operations of its sales representatives in New Mexico.

The other New Mexico cases cited, supra, state the rules under which New Mexico cannot lay a direct tax on interstate commerce or the gross receipts therefrom. Only when intrastate business is separate and distinct from interstate commerce can a tax be imposed upon the local activity. But a gross receipts tax on business which is intrastate does not permit the state to levy a tax on that part of the business which is interstate. Local activity is not a business activity subject to tax where no receipts are obtained from that local activity.

One of the purposes of the Gross Receipts Tax Act "is to provide revenue for public purposes . . . ." Section 72-16A-2. With this concept, I totally agree. But New Mexico must derive its revenues from what goes on within its own borders. In my opinion, the imposition of the gross receipts tax in this case would be unlawful under the United States Constitution.

Despite our private views, we must follow the decisions of the Supreme Court of the United States. *Western Live Stock*, supra. State taxation of interstate commerce is so elusive that it would take a

sanguine individual to assert he has found a solution to the problem under decisions of the Supreme Court of the United States. *B. F. Goodrich Co.*, supra.

The Supreme Court of the United States has now created another factor by which local activity can be taxed—when the foreign corporation maintains full-time employees in the locality who maintain valuable contractual relations between the foreign corporation and its in-state customer.

In *State of Wisconsin v. J .C. Penney Company*, 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267, 130 A.L.R. 1229 (1940), Mr. Justice Frankfurter essayed on the state's "baffling task of tapping fresh sources of revenue." In doing so, he coined a test which has survived the cacophony of tax decisions. He said:

> The simple but controlling question is whether the state has given anything for which it can ask return. [61 S.Ct. at 250, 85 L.Ed. at 270, 271].

*Standard Pressed Steel Co. v. Washington Dept. of Rev.*, 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975) presents the view of a unanimous court on the Frankfurter test. Here, Standard, a foreign corporation, sold aerospace fasteners to Boeing, an aerospace company in the State of Washington. Standard kept a Washington-based, salaried engineer who worked full time in the State of Washington. His primary duty was to consult with the Washington customer regarding its anticipated needs and to follow up any post-delivery difficulties in using the fasteners. He did not take orders from Boeing; they were sent directly to Standard. Orders accepted would be filled and shipment made by common carrier to Boeing direct, all payments being made directly to Standard. The Court said:

> For [Standard's] employee, Martinson, with a full-time job within the State, made possible the realization and *continuance of valuable contractual relations between [Standard] and Boeing*. [95 S. Ct. at 708].

In the instant case, ASI sales representatives in New Mexico contribute nothing toward the performance of the ASI-student contract. When the student's enrollment papers are sent to Chicago for acceptance, the salesman bows out of that transaction. The state has given ASI nothing for which it can ask return.

*Standard* makes reference to 19th century cases which gave *strength* to the meaning of interstate commerce and *weakness* in the taxation thereof. *Robbins v. Taxing District of Shelby County*, 120 U.S. 489, 7 S.Ct. 592, 30 L.Ed. 694 (1887); *Ficklen v. Taxing District of Shelby County*, 145 U. S. 1, 12 S.Ct. 810, 36 L.Ed. 601 (1892). This is the reverse of today's philosophy of the law of taxation.

In *Robbins*, Sabine Robbins, for his Ohio firm, was engaged in soliciting the sale of goods by sample in Memphis, Tennessee. Tennessee taxed "drummers" for this work. The Court said:

> In a word, it may be said, that in the matter of interstate commerce the United States are but one country, and are and must be subject to *one* system of regulations, and *not to a multitude of systems*. The doctrine of the freedom of that commerce, except as regulated by congress, is so firmly established that it is unnecessary to enlarge further on the subject.
>
> \*    \*    \*    \*    \*    \*
>
> As before said, *the State may tax its own internal commerce; but that does not give it any right to tax interstate commerce*. [Emphasis added] [120 U. S. at 494, 499, 7 S.Ct. at 594, 597, 30 L. Ed. at 696, 698].

*Ficklen* points out that in *Robbins*, the tax was not on Robbins, but on his principals. Where, however, by analogy, Robbins was established as a business in Tennessee, and negotiated sales between resident and non-resident merchants of goods situated in another state, a tax imposed is a tax on the business and not a tax on interstate commerce.

The *Robbins* "drummer case" has been consistently followed. *Commonwealth v. Olan Mills, Inc.*, 196 Va. 898, 86 S.E.2d 27 (1955); *Mills v. Town of Kingstree*, 236 S.C. 535, 115 S.E. 52 (1960). The basic reason is that the activity of the "drummer" in one state is so connected in fact with the activity of the company in another state that the first activity becomes an integral part of interstate commerce, each step being dependent upon the other for fruition.

In the instant case, the nature and extent of ASI's activity in New Mexico was nil. The conduct of its sales representatives became an integral part of interstate commerce. Under these circumstances, ASI was not subject to the gross receipts tax. "Here there was no invasion or exploitation of the consumer market in [New Mexico]." *Miller Bros. Co. v. Maryland*, 347 U.S. 340, 74 S.Ct. 535, 98 L.Ed. 744, 749 (1954). Other cases which support ASI in principle are *McLeod v. J. E. Dilworth Co.*, supra; *National Bellas Hess v. Illinois*, 386 U.S. 753, 87 S.Ct. 1389, 18 L. Ed.2d 505 (1967); *Norton Co. v. Dept. of Rev.*, 340 U.S. 534, 71 S.Ct. 377, 95 L.Ed. 517 (1951); *Evco v. Jones*, 409 U.S. 91, 93 S.Ct. 349, 34 L.Ed.2d 325 (1972); *Berkshire Fine Spinning Assoc. v. City of New York*, 5 N.Y.2d 347, 157 N.E.2d 614 (Ct. App.1959); *B. F. Goodrich Co. v. State*, supra; *State v. American Can Co.*, 117 Colo. 312, 186 P.2d 779 (1947).

In *Norton Co.*, supra, the Court said:

Where a corporation chooses to stay at home in all respects except to send abroad advertising or drummers to solicit orders which are sent directly to the home office for acceptance, filling, and delivery back to the buyer, it is obvious that the state of the buyer has no local grip on the seller. Unless some local incident occurs sufficient to bring the transaction within its taxing power, the vendor is not taxable. [340 U.S. at 537, 71 S.Ct. at 380, 95 L.Ed. at 520].

ASI falls within this concept of interstate commerce. The delivery back of "property" is not involved. ASI delivers back to the students a "service". No case has been cited and none has been found where a "service" was delivered back. Neither has a case been cited and none has been found, where a correspondence school, like that here involved, has been subject to state taxation. To do it in this case would impose a tax, and project our tax powers beyond the borders of the State of New Mexico. It would impose a tax on interstate commerce, a tax forbidden by the Constitution of the United States.

ASI is protected by the Commerce Clause.